**R. Anthony MARRESE and Michael R. Treister, Plaintiffs-Appellees,**

v.

**AMERICAN ACADEMY OF ORTHO-PAEDIC SURGEONS, Defendant-Appellant.**

**Nos. 81–2671, 83–2683.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1982.

Reargued En Banc Sept. 20, 1983.

Decided Jan. 3, 1984.

As Corrected Jan. 10, 1984.

See also 78 Ill.App.3d 746, 33 Ill.Dec. 501, 396 N.E.2d 1225.

D. Kendall Griffith, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant-appellant.

Michael T. Sawyier, Foss, Schuman & Drake, John J. Casey, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, and PELL, BAUER, WOOD, CUDAHY, ESCHBACH, POSNER, COFFEY and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

These consolidated appeals present important questions relating to the scope of the doctrine of res judicata in our system of dual state and federal courts, and to the responsibilities of federal district judges in controlling pretrial discovery.

In 1976 the American Academy of Orthopaedic Surgeons, a private association, rejected the plaintiffs' applications for membership, without a hearing or a statement of reasons. The plaintiffs sued the Academy in an Illinois state court, claiming among other things that the common law of Illinois and the Illinois constitution required the Academy to grant a hearing on their applications and to use reasonable standards in deciding whether to accept the applications. The plaintiffs made no claim under Illinois antitrust law; nor did they, at that time, bring a federal antitrust suit.

The Illinois Appellate Court ordered Dr. Treister's complaint dismissed for failure to state a claim, noting that membership in the Academy is not an "economic necessity," *Treister v. American Academy of Orthopaedic Surgeons,* 78 Ill.App.3d 746, 755–56, 33 Ill.Dec. 501, 508, 396 N.E.2d 1225, 1232 (1979), and the Illinois Supreme Court denied leave to appeal, 79 Ill.2d 630 (1980). Though alleged to confer professional advantages, membership in the Academy is not required for practicing as an orthopaedic surgeon or obtaining hospital staff privileges. Both plaintiffs are certified to practice orthopaedic surgery and have staff privileges at several hospitals.

Dr. Marrese was not a party to the appeal, but his suit was stayed pending Treister's appeal and was dismissed after Treister lost his appeal.

After losing in the Illinois Appellate Court, Dr. Treister (joined by Dr. Marrese) brought this suit in federal district court for damages and injunctive relief under section 1 of the Sherman Act, 15 U.S.C. § 1. The complaint alleged that the Academy is "a monopoly in its field, possessed of substantial power to control the market for orthopaedic surgical services," and that the plaintiffs were refused membership because they compete too vigorously with existing members of the Academy. The Academy moved to dismiss the complaint on the ground that the judgment in the plaintiffs' state-court action against the Academy was res judicata in the present suit. The motion was denied. 496 F.Supp. 236 (N.D.Ill.1980), on reconsideration, 524 F.Supp. 389 (N.D.Ill. 1981). The Academy asked the district judge to certify his denial for an immediate appeal under 28 U.S.C. § 1292(b), arguing that whether the suit was barred by res judicata was a controlling question of law. The judge refused and pretrial discovery began. The plaintiffs asked the Academy to produce its files relating to all denials of membership applications between 1970 and

1980. The Academy refused. When it persisted in its refusal after the district judge issued an order to produce, the judge held the Academy in criminal contempt and fined it $10,000. See Fed.R.Civ.P. 37(a)(2), 37(b)(2)(D).

No. 81–2671 is the Academy's appeal from the contempt judgment. A panel of this court reversed the judgment more than a year ago, 692 F.2d 1083 (1982), but rehearing en banc was granted and the panel decision was vacated (the practice in this circuit when rehearing en banc is ordered, see Circuit Operating Procedure 5(f)). However, the order granting rehearing en banc was later vacated and the original panel issued a new decision, again reversing the judgment of contempt, but on a narrower ground. 706 F.2d 1488, 1489 (1983). Rehearing en banc was again sought and granted, and the second panel decision was vacated. Shortly before the rehearing, Judge Plunkett, to whom the case in the district court had been reassigned from Judge Shadur, certified Judge Shadur's order denying the Academy's motion to dismiss the complaint on the ground of res judicata for immediate appeal under section 1292(b). The plaintiffs questioned Judge Plunkett's jurisdiction to issue such a certification in light of the pendency of the appeal from the contempt judgment. But a motions panel of this court held that he had jurisdiction, authorized the appeal (which is No. 83–2683), and ordered it consolidated with No. 81–2671 for the en banc hearing.

The jurisdictional ruling was correct. The Academy's appeal from the contempt judgment did not bring the whole case up to this court but just the contempt proceeding, a collateral branch of the case. The rest of the case remained (and remains) pending in the district court before Judge Plunkett. The contempt judgment itself was appealable under 28 U.S.C. § 1291. *Bray v. United States,* 423 U.S. 73, 96 S.Ct. 307, 46 L.Ed.2d 215 (1975).

We begin with No. 83–2683. As the main purpose of the doctrine of res judicata is to protect a defendant from being worn down by a plaintiff who sues him over and down by a plaintiff who sues him over and over again for the same allegedly wrongful conduct, a plaintiff may not sue the defendant on one theory and having lost try again on a different one. E.g., *Federated Department Stores v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *Mandarino v. Pollard,* 718 F.2d 845, 849–50 (7th Cir.1983); *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1277 (7th Cir.1983); *Lee v. City of Peoria,* 685 F.2d 196, 198 (7th Cir.1982); *Harper Plastics, Inc. v. Amoco Chemicals Corp.,* 657 F.2d 939, 945 (7th Cir.1981). But that is what the plaintiffs have been doing in this case. After being denied membership in the Academy almost eight years ago, they sued the Academy in state court under a variety of theories. Although they could have alleged a violation of the Illinois Antitrust Act, § 3(2), Ill.Rev.Stat.1981, ch. 38, § 60–3(2), they did not; and although they could have brought a federal antitrust suit in federal court at the same time and joined their state law claims as pendent claims, they did not do that either. They waited till they had lost their state lawsuits and only then—after four years of litigating in state court the lawfulness of the denial of their membership applications—did they bring suit. No reason has been given or appears why they did not bring an antitrust suit, state or federal or both, at the time of their initial suits. The plaintiffs assert that the Academy's antitrust liability is clearly established by *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)—a case that had been on the books for 17 years when the initial suits were filed.

But we are told that there is a technical obstacle to applying the doctrine of res judicata here: the plaintiffs could not have joined a Sherman Act claim with their state law claims in a suit brought in state court because federal courts have exclusive jurisdiction to enforce the federal antitrust laws. This proposition can be questioned. No statute purports to make the federal courts' jurisdiction over federal antitrust suits exclusive; compare 28 U.S.C. § 1338(a), which makes the jurisdiction of

the federal courts in patent and copyright cases "exclusive of the courts of the states," with 15 U.S.C. §§ 15, 26. And it is hard to understand why state courts should be thought less competent to enforce the federal antitrust laws than the federal civil rights laws—which they have jurisdiction concurrently with the federal courts to enforce, *Martinez v. California,* 444 U.S. 277, 283 n. 7, 100 S.Ct. 553, 558 n. 7, 62 L.Ed.2d 481 (1980)—particularly when state courts can adjudicate federal antitrust defenses with preclusive effect on questions of fact under the doctrine of collateral estoppel in a subsequent federal antitrust suit. *Lyons v. Westinghouse Elec. Corp.,* 222 F.2d 184, 188, 189 (2d Cir.1955); *RX Data Corp. v. Department of Social Services,* 684 F.2d 192, 196–97 and n. 4 (2d Cir.1982); *Calvert Fire Ins. Co. v. American Mutual Reinsurance Co.,* 600 F.2d 1228, 1236 n. 18 (7th Cir.1979) (dictum). We nevertheless accept, as settled law that only the Supreme Court can at this late date reconsider, that the plaintiffs could not have brought their Sherman Act suit in an Illinois state court. See *Blumenstock Bros. Advertising Agency v. Curtis Publishing Co.,* 252 U.S. 436, 440–41, 40 S.Ct. 385, 386–87, 64 L.Ed. 649 (1920); *General Investment Co. v. Lake Shore & Mich. S. Ry.,* 260 U.S. 261, 287, 43 S.Ct. 106, 117, 67 L.Ed. 244 (1922); *Kurek v. Pleasure Driveway & Park Dist.,* 583 F.2d 378, 379 (7th Cir.1978) (per curiam). But see Note, *Exclusive Jurisdiction of the Federal Courts in Private Civil Actions,* 70 Harv.L.Rev. 509, 510 n. 13 (1957).

The plaintiffs could, however, have joined with their other state claims a claim under the Illinois Antitrust Act, and if that Act is materially identical to the Sherman Act their failure to do so bars this suit under *Nash County Bd. of Educ. v. Biltmore Co.,* 640 F.2d 484, 487–93 (4th Cir.1981). The Attorney General of North Carolina had brought a state antitrust suit against a number of dairy companies. After final judgment was entered in that suit, a local board of education (held to be in privity with the state attorney general) brought a federal antitrust suit against the same defendants. The federal suit involved the identical facts and was brought under a federal antitrust statute that was worded identically to the state antitrust statute. The Fourth Circuit held the federal suit barred by res judicata.

*Nash* is supported by Justice Holmes' opinion for the Supreme Court in *Becher v. Contoure Laboratories, Inc.,* 279 U.S. 388, 391–92, 49 S.Ct. 356, 357–58, 73 L.Ed. 752 (1929), by academic authority, see Currie, *Res Judicata: The Neglected Defense,* 45 U.Chi.L.Rev. 317, 347–48 (1978), by the statement in *Moitie* that res judicata " 'should be cordially regarded and enforced by the courts,' " 452 U.S. at 401, 101 S.Ct. at 2429, quoting *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 508, 61 L.Ed. 1148 (1917), and by the practical need to contain the enormous growth of litigation in both state and federal courts by insisting that people litigate their claims in an economical and parsimonious fashion—a consideration emphasized in *Moitie,* see 452 U.S. at 401, 101 S.Ct. at 2429. True, there is much authority that is at least superficially contrary. See, e.g., *Abramson v. Pennwood Investment Corp.,* 392 F.2d 759, 762 (2d Cir.1968); *Clark v. Watchie,* 513 F.2d 994, 997 (9th Cir.1975); *Hayes v. Solomon,* 597 F.2d 958, 984–85 (5th Cir. 1979); *RX Data Corp. v. Department of Social Services, supra,* 684 F.2d at 198; Restatement (Second) of Judgments § 26, illustration 2 (1980). Cf. *Kurek v. Pleasure Driveway & Park Dist., supra,* 583 F.2d at 379. See generally 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4470 (1981). But it is mainly pre-*Nash* and pre-*Moitie;* we have found no decision that expressly rejects *Nash,* and, most important, no case that involves the precise situation in *Nash*—a state law that is a mirror image of federal law. *Hayes v. Solomon,* for example, emphasizes the difference between the state and federal statutes involved in that case. See 597 F.2d at 984. And in the recent case of *Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 818 n. 1 (9th Cir.1982), the conduct challenged under federal antitrust law was outside the

scope of the state antitrust law, so *Nash* was inapplicable.

It is not a good argument against *Nash* that the federal courts have no power to decide for themselves the res judicata effect of a state judgment in a federal suit because 28 U.S.C. § 1738 requires a federal court to give the judgments of a state's courts "the same full faith and credit . . . as they have by law or usage in the courts of such State." See *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Intended as it was to protect the authority of state courts, section 1738 ought not prevent a federal court from giving a state judgment *more* effect in a federal suit than the courts of the state would give it in a state suit. See Vestal, *Res Judicata/Preclusion by Judgment: The Law Applied in Federal Courts*, 66 Mich.L.Rev. 1723, 1736–39 (1968), and other references cited in *FDIC v. Eckhardt*, 691 F.2d 245, 247 (6th Cir.1982). A federal court does not undermine the authority of a state's courts when it holds that a state judgment bars a federal suit. Moreover, the federal courts have an interest independent of the states in preventing someone from litigating in federal court a claim he could have made in state court under state law as part of a state-court suit that he brought previously. But whether or not section 1738 allows a federal court to give a state court's judgment a greater preclusive effect than the state courts themselves would give it (an unsettled question, see, e.g., Wright, The Law of Federal Courts 690–91 (4th ed. 1983)), the statute cannot be used to decide this case. The Illinois courts, although hospitable to claims of res judicata, see *Morris v. Union Oil Co.*, 96 Ill.App.3d 148, 51 Ill.Dec. 770, 421 N.E.2d 278 (1981); *Baird & Warner, Inc. v. Addison Industrial Park, Inc.*, 70 Ill.App.3d 59, 63–65, 26 Ill.Dec. 1, 7–8, 387 N.E.2d 831, 837–38 (1979), have not spoken to the *Nash* issue and will never have occasion to do so, since no federal antitrust suit can be brought in a state court. The issue whether such a suit would be barred by res judicata therefore cannot arise. Section 1738 cannot be used to decide this case.

Another argument that could be made against *Nash* is that the federal courts' exclusive jurisdiction to enforce federal antitrust law must be based on a judgment that only federal judges can decide antitrust cases intelligently; if so, a plaintiff should not be coerced to bring his antitrust claim in state court under a state counterpart to the federal antitrust statutes. But the state attorney general in *Nash* was not coerced to sue in state court under state law first; he chose to do so. And similarly the plaintiffs in this case could have brought a federal antitrust suit at the same time as (or instead of) their state suit. Only strategy or misjudgment could have made them wait till a final judgment was entered in the state suit. Moreover, it unduly demeans state judges to say that they cannot administer antitrust principles intelligently. It is also inconsistent with the fact that states such as Illinois have adopted antitrust laws modeled on the federal laws, that the federal antitrust laws have not been held to preempt state antitrust law, as federal labor law, for example, has been held to preempt state labor law, see *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), and that federal courts give preclusive effect to state court factfindings in antitrust cases. Furthermore, since the doctrine of exclusive federal court jurisdiction over federal antitrust suits can only be intended to benefit defendants (for plaintiffs are always better off having a choice of different courts in which to bring their claims), it would be anomalous to use the doctrine to make an antitrust defendant defend himself a second time against the same claim, based on a new legal theory.

Assuming the *Nash* case was—as we believe—correctly decided, the next question is whether it is distinguishable from this case. The fact that the plaintiffs here based their state court actions not on the Illinois Antitrust Act but on other provisions of Illinois law does not distinguish the cases. The plaintiffs could have included in

their complaints a claim under the Illinois Antitrust Act and that is all that is necessary to bring res judicata into play. Otherwise a plaintiff could bring the same suit over and over again against the same defendant, simply changing legal theories. Our decision in *Harper Plastics, Inc. v. Amoco Chemicals Corp., supra,* bears on this point. It bars a plaintiff who has not joined his state law claims as pendent claims in a federal suit from suing on them after a final judgment is entered in the federal suit. 657 F.2d at 945-46. Therefore if the Nash County Board of Education had sued the defendants in federal court under federal antitrust law, a subsequent state suit would (in this circuit at least) have been barred.

The Illinois Antitrust Act, however, unlike the state antitrust law in *Nash,* see 640 F.2d at 488, is not identically worded to the counterpart federal law. The court in *Nash* did not decide whether a difference in wording between the state and federal statutes would have changed its result. See *id.* at 490, 492. The question should be answered not in gross but with reference to the specific provisions of the state and federal statutes, read in light of the specific allegations of the complaint. If, applied to the particular case, the state and federal standards are the same, it should not matter that applied to some other case they might be different.

Section 3(2) of the Illinois Antitrust Act forbids conspiracies and other agreements to restrain trade "unreasonably." The Illinois Appellate Court has held that a boycott challenged under this section could never be held to be illegal per se; it would have to be evaluated under the Rule of Reason. *Blake v. H-F Group Multiple Listing Service,* 36 Ill.App.3d 730, 743, 345 N.E.2d 18, 28 (1976). A conspiracy to fix prices or limit output is, however, illegal per se under the Illinois Antitrust Act, Ill.Rev.Stat.1981, ch. 38, § 60-3(1); see *People ex rel. Scott v. College Hills Corp.,* 91 Ill.2d 138, 151-53, 61 Ill.Dec. 766, 772, 435 N.E.2d 463, 469 (1982), as it is under section 1 of the Sherman Act, see, e.g., *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 and n. 59, 60 S.Ct. 811, 845 and n. 59, 84 L.Ed. 1129 (1940).

Although section 1 of the Sherman Act does not in words distinguish between boycotts and price-fixing conspiracies, in this circuit at least "boycotts are illegal per se only if used to enforce agreements that are themselves illegal per se—for example price-fixing agreements." Recently this language from the second panel opinion in this case (706 F.2d at 1495) was quoted approvingly by another panel considering a boycott by another medical association. *Wilk v. American Medical Ass'n,* 719 F.2d 207, 221 (7th Cir.1983). It is a correct statement of the law of the circuit. See *United States Trotting Ass'n v. Chicago Downs Ass'n,* 665 F.2d 781, 787-90 (7th Cir.1981) (en banc).

The complaint in the present case charges either a conspiracy to fix prices or limit output, a per se offense under federal as under Illinois law, or, more likely, a nonprice conspiracy to exclude rivals from a professional association, which under our precedents must be tested under the Rule of Reason—and the state law is again the same. Not only does the Illinois Antitrust Act make federal antitrust cases precedents in interpreting the Act, see Ill.Rev.Stat. 1981, ch. 38, ¶ 60-11, but the Illinois Supreme Court has indicated that the Rule of Reason has the same meaning under Illinois antitrust law as under federal antitrust law. See *People ex rel. Scott v. College Hills Corp., supra,* 91 Ill.2d at 154, 61 Ill. Dec. at 774, 435 N.E.2d at 471-72, citing federal cases as authoritative on the meaning of the Rule of Reason in section 3(2) cases.

Thus, there is no more difference in liability standards between state and federal law in this case than there was in *Nash.* The only possible difference is in the remedy. If the plaintiffs prove a price-fixing or output-limiting conspiracy, they are entitled under Illinois law as under federal antitrust law to an automatic trebling of their damages. See Ill.Rev.Stat.1981, ch. 38, § 60-7(2), Clayton Act, § 4, 15 U.S.C. § 15. But if they prove a violation just of the Rule of Reason, under federal law they would still be entitled to an automatic trebling of their damages but under the Illinois law applica-

ble to such violations, "if it is shown that [the] violation was willful, the court may, in its discretion, increase the amount recovered as damages up to a total of 3 times the amount of actual damages." Ill.Rev.Stat. 1981, ch. 38, § 60–7(2).

This might be an important difference in another case, but it has no practical significance in this one. Although the plaintiffs are now asking for damages as well as an injunction against their exclusion from membership in the Academy, it is doubtful that they had any objective in bringing this suit other than to get themselves admitted to membership. We cannot understand otherwise why their state-court suits, insofar as they challenged the denial of the plaintiffs' membership applications, were purely for injunctive relief, and why the plaintiffs did not at that time—seven years ago—either add a state antitrust count to their complaints or bring a federal antitrust suit. The state suits did seek damages, but only on the theory that the application forms which the plaintiffs had filled out were contracts that the Academy had broken by distributing a list of applicants with the plaintiffs' names on it. See 78 Ill. App.3d at 751, 758–59, 33 Ill.Dec. at 505, 509–10, 396 N.E.2d at 1229, 1233–34. The plaintiffs did not seek any damages for being excluded from membership; their federal antitrust suit contains no reference to the facts underlying the breach of contract claim; and because they filed their antitrust suit more than four years after the alleged breach of contract, any attempt to tease an antitrust violation out of the alleged breach would be barred by the four-year federal antitrust statute of limitations. 15 U.S.C. § 15b.

The timing more than suggests that the plaintiffs do not care about treble damages. As busy and successful surgeons with staff privileges at several hospitals (four for Marrese, seven for Treister) they may not think they can prove any actual damages— the prerequisite for getting treble damages—from having been denied membership in the Academy. Although the exact nature of the Academy is unclear from the limited record before us, we know that it

has no licensing function, that its meetings are open to nonmembers, and that Dr. Treister once gave an invited paper at a meeting of the Academy. And certainly when the plaintiffs first sued the Academy in 1976, damages resulting from their exclusion were not in their thinking; no such damages were alleged. A suit under the Illinois Antitrust Act would therefore have been a perfect substitute for a federal antitrust suit—even if the Illinois Act had contained no damages provision at all.

This is not a case like *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 274 (7th Cir. 1981), where the plaintiff alleged in his federal antitrust suit that the state court suit that the defendants had pleaded as res judicata was itself part of the unlawful conspiracy. Marrese and Treister had a full and fair opportunity to litigate their claims in their earlier suits. Cf. *Lee v. City of Peoria, supra,* 685 F.2d at 201. And although the application of res judicata often produces a harsh result, the result here is less harsh than in many other cases, such as *Harrington v. Vandalia-Butler Board of Educ.,* 649 F.2d 434, 437–40 (6th Cir.1981). Harrington brought a Title VII discrimination suit against a municipal corporation, and won. She could have gotten damages in that suit if she had joined with her Title VII claim a claim under 42 U.S.C. § 1983, but she did not do so, because the law was clear that municipal corporations were immune from liability under section 1983. After the final judgment in the Title VII suit the Supreme Court abrogated municipal immunity, and Harrington then brought her section 1983 suit. It was held barred by res judicata. As a practical matter Harrington had less opportunity to pursue her 1983 claim at the time of her first suit than Marrese and Treister had to pursue their antitrust claims at the time of their initial suits, which they could have done either by adding a count under the Illinois Antitrust Act or by bringing a separate federal antitrust suit.

■ We turn to No. 81–2671, the Academy's appeal from the $10,000 fine for

contempt of Judge Shadur's discovery order. The first question is whether the appeal brings up to us the validity of the discovery order. The panel that originally decided this appeal was unanimous that it did, see 692 F.2d at 1087–88 (majority opinion), 1096 (dissenting opinion); 706 F.2d at 1492–93, and we agree. If a party is willing to pay the price of being punished for contempt (or suffering an equivalent sanction such as dismissal of the complaint) if the validity of the order he has disobeyed is ultimately upheld, he can get immediate review of that order by appealing from the contempt judgment. *United States v. Ryan,* 402 U.S. 530, 532–33, 91 S.Ct. 1580, 1581–82, 29 L.Ed.2d 85 (1971); *Ryan v. Commissioner,* 517 F.2d 13, 19–20 (7th Cir. 1975); *Hanley v. James McHugh Construction Co.,* 419 F.2d 955, 957 (7th Cir.1969). Cf. *National Utility Service, Inc. v. Northwestern Steel & Wire Serv., Inc.,* 426 F.2d 222 (7th Cir.1970); *Hastings v. North East Independent School Dist.,* 615 F.2d 628, 631 (5th Cir.1980). If the underlying order is invalidated, the contempt judgment falls with it. See *Hanley v. James McHugh Construction Co., supra,* 419 F.2d at 956, 958; cf. *United States v. Ryan, supra,* 402 U.S. at 533, 91 S.Ct. at 1582.

Yet in apparent contradiction to the above, many decisions state that the validity of a contempt judgment is independent of the validity of the underlying order. See, e.g., *Howat v. Kansas,* 258 U.S. 181, 189–90, 42 S.Ct. 277, 280–81, 66 L.Ed. 550 (1922); *United States v. United Mine Workers,* 330 U.S. 258, 291–94, 67 S.Ct. 677, 694–96, 91 L.Ed. 884 (1947); *Blocksom & Co. v. Marshall,* 582 F.2d 1122, 1124 (7th Cir.1978); *ITT Community Development Corp. v. Barton,* 569 F.2d 1351, 1356 (5th Cir.1978). "Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect." *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975). Equally broad language appears in *Howat* and *United Mine Workers.*

The difference between the two lines of cases cannot be the difference between civil and criminal contempt, because both are lines of criminal contempt cases. An order adjudging a party in civil contempt is not even an appealable final order. *Fox v. Capital Co.,* 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936); Wright, The Law of Federal Courts 703 and n. 37 (4th ed. 1983). However, the two lines of cases can be reconciled by noting that in the cases where the validity of the underlying order was held not to be reviewable on appeal from the judgment of contempt, the order could have been appealed as of right directly, or otherwise reviewed other than by appeal from the contempt judgment. See *Hanley v. McHugh Construction Co., supra,* 419 F.2d at 957; *United States v. Ryan, supra,* 402 U.S. at 532 n. 4, 91 S.Ct. at 1582 n. 4; *Maness v. Meyers, supra,* 419 U.S. at 460, 95 S.Ct. at 592; *Blocksom & Co. v. Marshall, supra,* 582 F.2d at 1124; 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3537, at pp. 340–41 (1975).

In *United Mine Workers,* for example, the union that was punished for contempt had failed to move to dissolve the temporary restraining order that it disobeyed. See 330 U.S. at 290, 67 S.Ct. at 694. Moreover, as soon as the temporary restraining order ripened into a preliminary injunction (as it did, see *id.* at 296, 67 S.Ct. at 697), the union could have appealed as of right under 28 U.S.C. § 1292(a)(1). Discovery orders, however, are not appealable. See Wright, *supra,* at 550–51. The right to appellate review of a judgment for contempt of a discovery order is thus a safety valve in the final-judgment rule of 28 U.S.C. § 1291. In *United States v. Ryan, supra,* in holding that an order to comply with a subpoena was not appealable, the Supreme Court noted that "If, as [the person subpoenaed] claims, the subpoena is unduly burdensome or otherwise unlawful, he may refuse to comply and litigate those questions in the event that contempt or similar proceedings are brought against him." 402 U.S. at 532, 91 S.Ct. at 1582. That is just what the Academy did in this case. The Court in *Ryan* explained in a footnote that its holding in earlier cases "that the claims there

sought to be asserted were not open on review of petitioners' contempt convictions was based upon the availability of review of those claims at an earlier stage." *Id.* at 532 n. 4, 91 S.Ct. at 1582 n. 4. The Academy could not have gotten review of the discovery order at any stage earlier than the judgment of contempt for disobeying it.

Although, as this case illustrates, discovery orders may impose heavy and irrecoverable costs on a party, to make every such order appealable as of right would lead to unacceptable delays in litigation. Confining the right to get appellate review of discovery orders to cases where the party against whom the order was directed cared enough to incur a sanction for contempt is a crude but serviceable method, well established in the case law, of identifying the most burdensome discovery orders and in effect waiving the finality requirement for them.

■ The validity of the discovery order that the Academy disobeyed is therefore properly before us. The next question is whether the order is invalid merely because, as we have just held, Judge Shadur should have dismissed the suit on res judicata grounds before the order was entered. Although we cannot find any authority on the precise question, probably because criminal contempt is a rarely imposed sanction for violation of a discovery order, we believe that the discovery order does fall with the underlying suit. You cannot (with exceptions not pertinent here) get discovery in the federal courts unless you have a pending lawsuit, and if it turns out that the lawsuit should not have been pending because it was barred at the outset by res judicata we think it follows logically and practically that the discovery order exceeded the judge's authority.

And, as we have noted, if the order is invalid the contempt judgment must be set aside. For this is not a case where the appellant bypassed the established procedure for getting appellate review of the order; there was no other procedure but to disobey the order and be held in contempt. The Academy was not held in contempt for "obstructive and disruptive courtroom conduct," as in *United States v. Seale,* 461 F.2d 345, 361 (7th Cir.1972), or for having destroyed its files rather than produce them, or for otherwise having shown disrespect for the orderly processes of the law; then the punishment would not be for violating an order but for the manner of the violation. Nothing of that sort is involved. The Academy, not in a provocative manner, disobeyed the discovery order because of a reasonable, and as it has turned out a correct, belief that the order was invalid—invalid on the very ground (res judicata) designed to protect a defendant from being harassed by repetitious litigation—and because disobeying the order and being punished for the disobedience was the only way, and a proper way, that the Academy could get appellate review.

This is not to say that anyone who wants to get the merits of his suit reviewed by this court without waiting for a final judgment to be entered or an interlocutory appeal to be certified under 28 U.S.C. § 1292(b) need only refuse to obey the first discovery order that the district judge issues in the case and then appeal from whatever (appealable) sanction the district judge imposes for the disobedience. We have not reviewed the district court's res judicata determination as part of our review of the appeal from the contempt judgment, but on review of an independent appeal (No. 83–2683) taken under section 1292(b).

■ We need not rest our decision in No. 81–2671 (contempt) entirely on our decision in No. 83–2683 (res judicata). The argument made in No. 81–2671 that whether or not the entire case should have been dismissed on res judicata grounds the contempt judgment should be reversed because the discovery order violated Rule 26 of the Federal Rules of Civil Procedure has been fully briefed and argued to us, was discussed at length in both panel decisions, and is ripe for decision.

Rule 37(a)(2), authorizing discovery orders, must be read in light of Rule 26(c), which empowers the district court to "make any order which justice requires to protect

a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... that discovery not be had ...," and Rule 26(d), which empowers the court, "upon motion, for the convenience of parties and witnesses and in the interests of justice," to control the sequence and timing of discovery. Of course the effective management of complex litigation requires that the district judge be allowed a broad discretion in guiding the discovery process, *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1240 (6th Cir.1981), and hence in deciding whether to limit discovery in accordance with Rules 26(c) or (d). But his discretion is not unlimited; if we have a firm conviction that he has made a mistake, we must reverse. *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 436 (10th Cir.1977). This was the test suggested by Justice Stewart, in his opinion dissenting from the second panel decision, for reviewing the discovery order in this case. See 706 F.2d at 1498.

A motion under Rule 26(c) to limit discovery requires the district judge to compare the hardship to the party against whom discovery is sought, if discovery is allowed, with the hardship to the party seeking discovery if discovery is denied. He must consider the nature of the hardship as well as its magnitude and thus give more weight to interests that have a distinctively social value than to purely private interests; and he must consider the possibility of reconciling the competing interests through a carefully crafted protective order. He must go through the same analysis under Rule 26(d) except that an order merely postponing a particular discovery request obviously should be granted more freely than one denying the request altogether.

In an effort to show that more than purely private interests are at stake the Academy argues that its membership files are protected by the First Amendment. If meant to establish a complete immunity from pretrial discovery of these materials the argument is untenable in light of *Memorial Hospital for McHenry Cty. v. Shadur,* 664 F.2d 1058, 1063 (7th Cir.1981) (per curiam), which rejected a claim of privilege

for a hospital's records of disciplinary proceedings against staff physicians. Even if the Academy were engaged in advocating controversial views and the publication of its internal files would expose members to retaliation for those views, it would not have an absolute privilege against discovery, though the plaintiffs would then have the burden of showing that the information sought was essential to their case and unobtainable by other means that would be less likely to discourage such advocacy. See *Hastings v. North East Independent School Dist., supra,* 615 F.2d at 632; *In re Petroleum Prods. Antitrust Litigation,* 680 F.2d 5, 7 (2d Cir.1982); *Gray v. Board of Educ.,* 692 F.2d 901, 903–05 (2d Cir.1982).

Yet there is in this case, if not a First Amendment right, at least a First Amendment interest, which the discovery sought by the plaintiffs would impair and which differentiates this case from the usual antitrust case, where discovery is sought of invoices or salesmen's reports or the minutes of a board of directors' meeting. In *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), a case involving resistance to pretrial discovery of membership lists, the Supreme Court recognized a First Amendment right of association for the purpose of expressing ideas. The American Academy of Orthopaedic Surgeons is not the NAACP, but neither is it a country club or a trade association; it is a professional association and a forum for exchanges of information about surgical techniques and related matters of substantial public interest. We do not understand the plaintiffs to be contesting the Academy's self-description in one of its pleadings in this case: "a professional society of board certified surgeons which exists for the purposes of encouraging research in the medical specialty of orthopaedics, and of sponsoring educational programs relating to the field of orthopaedic surgery which may be of interest to physicians." If the Academy has to reveal its membership files, members may be reluctant to offer candid evaluations of applicants, and the atmosphere of mutual confidence that encour-

ages a free exchange of ideas will be eroded.

The Constitution to one side, one does not have to be a student of Aristotle and de Tocqueville to know that voluntary associations are important to many people, Americans in particular, and that voluntary professional associations are important to American professionals (the premise of the plaintiffs' antitrust suit, as it was of their Illinois suits). Since an association would not be genuinely voluntary if the members were not allowed to consider applications for new members in confidence, the involuntary disclosure of deliberations on membership applications cannot but undermine the voluntary character of an association and therefore harm worthy interests, whether or not those interests derive any additional dignity from the First Amendment. The threat to such interests is more than speculative in this case. Dr. Marrese's counsel said at the rehearing en banc that he wants to use the membership files as a source of names of Academy members to depose in an effort to find out the motives behind their opposition to his client's application. It is hard to believe that after members of the Academy find themselves deposed for this purpose they will still be willing to offer candid evaluations of prospective members.

The other side of the coin is that barring the plaintiffs or their counsel from all access to the membership files would probably make it impossible for them to prove their antitrust case. But there were various devices that the district judge could have used to reconcile the parties' competing needs. For example, he could have examined the membership files himself *in camera,* a procedure described by the Supreme Court in a related context as "a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of irrelevance and privilege and plaintiffs' asserted need for the documents is correctly struck." *Kerr v. United States District Court,* 426 U.S. 394, 405, 96 S.Ct. 2119, 2125, 48 L.Ed.2d 725 (1976). We are told the membership files may be voluminous. No doubt the files in *all* cases between 1970

and 1980 where applications for membership in the Academy were refused are voluminous, but the place to start an *in camera* examination would be with the files on Drs. Marrese and Treister. If the judge found no evidence in those files of any anticompetitive purpose attributable to the Academy, he would not have to look at any other files. This is not a class action; the plaintiffs are not suing as the representatives of other orthopaedic surgeons who have been denied membership in the Academy.

Better yet, the judge might have followed the procedure discussed in this court's recent decision in *EEOC v. University of Notre Dame Du Lac,* 715 F.2d 331, 338–39 (7th Cir.1983). There we ordered the files of faculty tenure deliberations edited ("redacted") to remove the names of the deliberating faculty members and any other information that might enable them to be identified, and we directed that on remand the redaction be reviewed *in camera* by the district judge, who would have the originals before him to compare with (and thereby assure the accuracy of) the redactions. Had the same procedure been followed here, the plaintiffs' counsel would have been able to read the files personally. If the files had turned out to contain evidence or leads to evidence of anticompetitive conduct, the plaintiffs' counsel could then have requested the judge to order names revealed to counsel so that the relevant individuals could be deposed. We do not think that only universities should be entitled to such consideration.

The protective order that the judge did enter ("which draws on each party's submission but parallels neither," in his words) was not well designed to protect the privacy of the Academy's members. It not only allowed the plaintiffs themselves—two disappointed applicants for membership—to read the files on their own applications; it allowed the plaintiffs' counsel "to discuss with plaintiffs the general contents" of all of the other files and to depose anyone whose name they found in the files. The order was not calculated to allay the

Academy's justifiable anxiety for the confidentiality of its membership deliberations.

Rule 26(d) (control of the sequence and timing of discovery) provided another method of accommodating the competing interests here with minimal damage to either. If there is other discovery that a plaintiff must complete in order to be able to resist a motion by the defendant for summary judgment, and thus a significant probability that his case will fail regardless of what the internal files he is seeking may show, the district judge has the power under Rule 26(d) to require the plaintiff to complete the other, nonsensitive discovery first. See Wright & Miller, Federal Practice and Procedure §§ 2040, 2047. And in an appropriate case he has the duty. "As a threshold matter, the court should be satisfied that a claim is not frivolous, a pretense for using discovery powers in a fishing expedition. In this case, plaintiff should show that it can establish jury issues on the essential elements of its case not the subject of the contested discovery." *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 597 (1st Cir.1980). Cf. *McBride v. Merrell Dow & Pharmaceuticals Inc.,* 717 F.2d 1460, 1467 (D.C.Cir.1983).

Of course, if the plaintiffs do not need anything beyond the contents of the Academy's membership files to prove their case, they cannot be asked to do any other discovery before getting access to the files. At oral argument we asked Dr. Marrese's counsel whether his discovery would be complete after he saw the membership files and followed up any leads the files contained. He answered that at that point he would file a motion for summary judgment arguing that the Academy had committed a per se violation of the Sherman Act, but that if the motion was denied he would conduct additional discovery, which he admitted would be necessary to prove a Rule of Reason violation. It is unlikely that the district judge would allow him to proceed in so piecemeal a fashion. The judge probably would tell him to complete discovery before moving for summary judgment. See 10 Wright, Miller & Kane, Federal Practice and Procedure § 2717 at p. 666 (1983). Assuming discovery would not be at an end when the files were turned over and any leads contained in them were tracked down, Rule 26(d) could have been used to schedule the sensitive discovery last.

We do not hold that all files of all voluntary associations are sacrosanct; we do not even hold that the membership files of an association of medical professionals are sacrosanct. They are discoverable in appropriate circumstances, subject to appropriate safeguards. But we may not ignore as judges what we know as lawyers—that discovery of sensitive documents is sometimes sought not to gather evidence that will help the party seeking discovery to prevail on the merits of his case but to coerce his opponent to settle regardless of the merits rather than have to produce the documents. In a survey of Chicago lawyers, "Several lawyers reported using discovery to try to 'move' cases toward settlement. For some attorneys this meant little more than trying to pick a propitious moment to serve a major discovery request, hoping that an opponent would rather settle than respond. *For others it meant asking for information about which they knew opposing parties were particularly sensitive* or using a deposition to 'educate' an opponent about the weaknesses of his case or the cost of litigation." Brazil, *Civil Discovery: Lawyers' Views of Its Effectiveness, Its Principal Problems and Abuses,* 1980 A.B.F.Res.J. 789, 858 (emphasis added). (Of course the problem is not limited to Chicago!) "Unnecessary intrusions into the privacy of the individual, high costs to the litigants, and correspondingly unfair use of the discovery process as a lever toward settlement have come to be part of some lawyers' trial strategy." Erickson, *The Pound Conference Recommendations: A Blueprint for the Justice System in the Twenty-First Century,* 76 F.R.D. 277, 288 (1980).

Many other judges and commentators have voiced concern over the use of discovery to force settlement in groundless cases. See, e.g., *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975); *Herbert*

v. Lando, 441 U.S. 153, 176, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979); ACF Industries, Inc. v. EEOC, 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 52 (1979) (Powell, Stewart, and Rehnquist, JJ., dissenting from denial of certiorari); Cohn, Federal Discovery: A Survey of Local Rules and Practices in View of Proposed Changes to the Federal Rules, 63 Minn.L.Rev. 253, 255–56 (1979); Kaminsky, Proposed Federal Discovery Rules for Complex Litigation, 48 Fordham L.Rev. 907, 922 (1980); Renfrew, Discovery Sanctions: A Judicial Perspective, 67 Cal.L. Rev. 264 (1979); Setear, The Sources and Reform of Discovery Abuse 5–6 (Wkg. Paper No. 11, Center for Studies in Law, Economics & Pub. Policy, Yale Law School, June 1983); Comment, Discovery Abuse Under the Federal Rules: Causes and Cures, 92 Yale L.J. 352 (1982). There is at least a hint of predatory discovery in this case in the fact that the plaintiffs did not seek access to the federal court system with its liberal discovery rules till after they had lost their state-court suit, and in the determination expressed by Dr. Marrese's counsel to use the Academy's membership files as the basis for deposing the individuals who voted against his client's membership application.

There are so many ways in which Judge Shadur could have prevented the plaintiffs from abusing the discovery process, without denying them any information essential to developing their case, that we are left with the firm conviction that the discovery order he issued, when he issued it, was erroneous. Our conclusion is consistent with the evolving concept of the district judge's managerial responsibility in complex litigation. Although amended Fed.R.Civ.P. 26(b)(1), which expands that responsibility, did not take effect until August 1, 1983, after the discovery order in issue here was issued, the Advisory Committee's Note indicates that the purpose of the amended rule is in part to remind federal district judges of their broad powers—and, we believe, correlative responsibilities—under Rule 26.

This case illustrates the pathological delays that are all too frequent in modern litigation. After nearly eight years of state and federal litigation, the case remains stalled in the earliest stages of discovery. It has gone on long enough. In No. 81–2671, the contempt judgment is reversed with directions to dismiss the contempt proceeding. In No. 83–2683, the order denying the defendant's motion to dismiss the underlying suit is reversed with directions to grant the motion and dismiss the complaint with prejudice.

BAUER, Circuit Judge, concurring.

I concur in the result. Moreover, if I thought it necessary I would approve that portion of the opinion which holds the discovery order invalid. It is, however, sufficient, in my opinion, to rule that the complaint should have been dismissed on res judicata grounds.

ESCHBACH, Circuit Judge, concurring in part and dissenting in part.

For the reasons expressed in the majority opinion, I agree that the discovery order constituted an abuse of discretion. I therefore concur in the judgment in No. 81–2671. Because I cannot agree that res judicata bars the federal antitrust claims, however, I respectfully dissent in No. 83–8046.

Judge Cudahy recites, as Justice Stewart did before him, an impressive array of authorities contrary to the majority's holding that res judicata bars the plaintiffs' case. See, e.g., Hayes v. Solomon, 597 F.2d 958, 984 n. 19 (5th Cir.1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); Kurek v. Pleasure Driveway and Park District of Peoria, 583 F.2d 378, 379 (7th Cir.1978), cert. denied, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979); Restatement (Second) of Judgments § 26(1)(c) comment c, illustration 2 (1982). Moreover, the majority's primary source of support, Nash County Board of Education v. Biltmore Co., 640 F.2d 484 (4th Cir.1981), is clearly distinguishable in that it involved an attempt to relitigate an antitrust claim. Notwithstanding the force of Judge Posner's opinion, therefore, I would adhere to

the precedents and affirm the order in No. 83–8046.

FLAUM, Circuit Judge, concurring in part and dissenting in part.

I agree with Judge Posner that this suit should be dismissed under the doctrine of res judicata, but I arrive at this position through a different analysis. Judge Posner fits his result into the existing strictures of res judicata doctrine by finding that the plaintiffs could have brought their entire cause of action in one court. I would hold instead that in finding this suit barred by res judicata, it is unnecessary to find that the plaintiffs could have brought all their claims in one court, as long as they could have brought all their claims contemporaneously in different courts. We should treat this matter as we would any other case in which the plaintiff litigates a dispute under one theory, loses, and then brings a second suit to litigate the same dispute under a different theory.[1] In such a situation, absent equitable circumstances not present here, fairness to a defendant requires that the second suit be barred by res judicata.

The basic principles of res judicata were stated recently by this court in the case of *Mandarino v. Pollard,* 718 F.2d 845 (7th Cir.1983):

"The doctrine of res judicata is that a final judgment on the merits in a court of competent jurisdiction bars the same parties or their privies from relitigating not only the issues which were in fact raised and decided but also all other issues which could have been raised in the prior action.... The essential elements of the doctrine are generally stated to be: (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits."

At 849 (quoting *Lee v. City of Peoria,* 685 F.2d 196, 199 (7th Cir.1982)). In the present case, the res judicata controversy revolves around whether there is an identity of the cause of action and whether the issues in the present suit should and could have been raised earlier.

As a threshold matter, there is a question about which body of res judicata law should be applied here. As Judge Cudahy points out, there is language in the Supreme Court case of *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), that suggests that when a federal court determines the preclusive effect of an earlier state judgment, it always must follow the res judicata rules of the state from which the judgment is taken. ("It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments." *Id.* at 481–82, 102 S.Ct. at 1897–98.) However, the Supreme Court in *Kremer* did not hold that a federal court may not give a state court judgment *greater* preclusive effect than the courts of that state would give it.[2]

---

1. Although Dr. Marrese's state court suit was not actually dismissed until after his federal suit was filed, it appears from the record before us that it was effectively defunct before his federal suit was filed. Once Dr. Treister's suit went to the Illinois Appellate Court on appeal, Dr. Marrese's suit, which raised identical issues, was stayed by the circuit court pending Dr. Treister's appeal. The Illinois Appellate Court affirmed the dismissal of Dr. Treister's complaint for failure to state a cause of action in October of 1979, and shortly thereafter the Illinois Supreme Court denied Dr. Treister's petition for leave to appeal. Following this denial, on March 21, 1980, both Dr. Marrese and Dr. Treister filed this action in federal court. I find nothing in the record indicating the reason that Dr. Marrese's suit was not dismissed following the dismissal of Dr. Treister's identical

suit. In the absence of contrary evidence, there is a compelling inference that Dr. Marrese expected that his state suit would be dismissed at the time he filed his federal suit.

2. In *Kremer,* the Court stated: "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Kremer v. Chemical Construction Corp.,* 456 U.S. at 482, 102 S.Ct. at 1898 (quoting *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)). However, the Court did not state that federal courts must refuse to give preclusive effect to state-court judgments when the courts of the state from which the judgments emerged would so refuse.

As Judge Posner notes, there is no reason for such a holding. In *Kremer* itself, the Court stated that Congress's purpose in enacting section 1738 was "specifically to insure that federal courts ... would be bound by state judgments." *Id.* at 484 n. 24, 102 S.Ct. at 1889 n. 24. *See also Davis v. Davis,* 305 U.S. 32, 40, 59 S.Ct. 3, 6, 83 L.Ed. 26 (1938). The requirement that the federal courts give the same credit to state court judgments as would the courts of that state thus can be interpreted as a convenient means to ensure that state judgments are given full credit; it is not an end in itself. Therefore, I agree with Judge Posner that we are not constrained by section 1738 as long as we do not give a state court judgment less preclusive effect than would the courts of the state from which the judgment is taken.

Though we are not bound by Illinois law, the Illinois courts have stated traditional res judicata principles that are applicable to the facts of this case. Under Illinois law, a cause of action for purposes of res judicata is defined as follows:

[A] cause of action consists of a single core of operative facts which give the plaintiff a right to seek redress for the wrong concerned. Even though one group of facts may give rise to different claims for relief upon different theories of recovery, there remains a single cause of action.

*Morris v. Union Oil Co. of California,* 96 Ill.App.3d 148, 157, 51 Ill.Dec. 770, 777, 421 N.E.2d 278, 285 (1981), *quoted in Lee v. City of Peoria,* 685 F.2d at 200. *See also Gasbarra v. Park-Ohio Industries,* 655 F.2d 119, 121 (7th Cir.1981) (courts have sought to discover "whether the entire amount claimed to be due plaintiff arises out of one and the same act or contract") (quoting *Freeman & Co. v. Regan Co.,* 332 Ill.App. 637, 645, 76 N.E.2d 514, 517–18 (1947)). The Illinois courts also have stated that plaintiffs are required to set out in their pleadings all grounds for recovery that they may have. They may not maintain a subsequent suit after the loss of an earlier one based upon the same facts by the simple expediency of limiting the theories of recovery advanced in the pleadings of the first. *Baird & War-*

*ner v. Addison Industrial Park,* 70 Ill. App.3d 59, 64, 26 Ill.Dec. 1, 7, 387 N.E.2d 831, 837 (1979); *Prochotsky v. Union Central Life Insurance,* 2 Ill.App.3d 354, 356, 276 N.E.2d 388, 390 (1971). These rules are founded upon "the plainest and most substantial justice, that litigation should have an end and that no person should be unnecessarily harassed with a multiplicity of suits." *Baird & Warner v. Addison Industrial Park,* 70 Ill.App.3d at 64, 26 Ill.Dec. at 7, 387 N.E.2d at 837. *See also Dorland v. Steinbrecher,* 50 Ill.App.2d 344, 347, 200 N.E.2d 424, 425 (1964).

As a matter of federal law, the plaintiffs' earlier state court suits and their current federal suit should be considered to involve the same cause of action for purposes of res judicata. In each suit, the plaintiffs essentially were challenging the legality of the defendant's admissions procedures. In the state suits, their position was based on the theory that the procedures were in violation of state common law and due process. In their federal suit, they have claimed that the procedures amount to a group boycott, in violation of federal antitrust law. The state and federal suits revolve around the same set of operative facts: the facts relating to the manner in which the defendant has chosen to limit its membership. In short, the suits are so closely related that logic dictates that the principles of res judicata should be applied to them.

This pragmatic approach to identifying a cause of action has significant support in both the law and legal literature. The Restatement (Second) of Judgments, which uses the terms "cause of action" and "claim" interchangeably, states:

[T]he concept of a transaction ... connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes.

The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights.[3]

RESTATEMENT (SECOND) OF JUDGMENTS § 24 comments a and b (1980). Professor Currie, cited by Judge Posner, has also suggested a pragmatic approach to the application of res judicata, one in which the "cause of action" terminology would be unnecessary: "Perhaps the time has come . . . to ask simply whether the party to be precluded had adequate opportunity to litigate the matter in the earlier proceeding and whether the matter is closely enough related to the original controversy so that judicial economy would be served by confining litigation to one proceeding." Currie, *Res Judicata: The Neglected Defense*, 45 U.Chi.L. Rev. 317, 342 (1978).[4] Finally, and most importantly, it should be noted that this circuit has previously adopted a pragmatic approach to determining what constitutes a cause of action. *See Himel v. Continental Illinois National Bank*, 596 F.2d 205, 209 (7th Cir.1979) ("primary test for determining if two suits are premised on the same cause of action is whether both suits arise under the same factual situation"), *quoted in Gasbarra v. Park-Ohio, Inc.*, 655 F.2d at

121. *See also Lambert v. Conrad*, 536 F.2d 1183, 1186 (7th Cir.1976) ("[s]ince both suits pertain to the same disputed facts and arise out of the same operative facts, they clearly are the same cause of action").

Having determined that the suits at issue here involved identical causes of action for purposes of the res judicata doctrine, the question now becomes whether the substance of the present suit could have been raised earlier. A basic tenet of the res judicata doctrine is that a party may not litigate a dispute and then, upon an unsuccessful disposition, revive the same cause of action with a new theory. This principle has been stated repeatedly by this and other circuits. *See, e.g., Mandarino v. Pollard*, 718 F.2d 845 at 849 (7th Cir.1983); *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 657 F.2d 939, 945 (7th Cir.1981); *Roach v. Teamsters Local Union No. 688*, 595 F.2d 446, 450 (8th Cir.1979); *Astron Industrial Associates v. Chrysler Motors*, 405 F.2d 958, 961–62 (5th Cir.1968); *Grace v. Grace*, 394 F.2d 127, 128 (2d Cir.1968); *Brotherhood of Railroad Trainmen v. Chicago, Milwaukee, St. Paul & Pacific Railroad*, 380 F.2d 605, 608 (D.C.Cir.1967).[5] The instance where a party does attempt to revive an unsuccessful cause of action with a new theory is a particularly compelling case for the application of res judicata principles because it is almost always avoidable and can involve significant inconvenience to a defendant. One of the primary purposes of the res judicata doctrine is to protect defendants from the expense and vexation attending multiple lawsuits. *Montana v. United*

---

**3.** As Judge Cudahy notes, there is some authority in Illinois law for a similarity of evidence test to determine identity of causes of action. However, Illinois courts have explicitly stated that this is only one test that can be employed for this purpose. *See LaGrange Federal Savings and Loan Association v. Rock River Corp.*, 97 Ill.App.3d 712, 715, 53 Ill.Dec. 112, 115, 423 N.E.2d 496, 500 (1981); *Rotogravure Service, Inc. v. R.W. Borrowdale Co.*, 77 Ill.App.3d 518, 525, 32 Ill.Dec. 762, 769, 395 N.E.2d 1143, 1148 (1978).

**4.** Professor Currie is correct in suggesting that the sometimes overly technical inquiry into whether two suits involve the same cause of action can obfuscate the more fundamental inquiry for purposes of res judicata: whether the

suits are related in such a way that a final determination in one should bar litigation of the other.

**5.** This principle also has been stated as follows:
Having been defeated on the merits in one action, a plaintiff sometimes attempts another action seeking the same or approximately the same relief but adducing a different substantive law premise or ground. This does not constitute the presentation of a new claim when the new premise or ground is related to the same transaction or series of transactions, and accordingly the second action should be held barred.
RESTATEMENT (SECOND) OF JUDGMENTS, § 25 comment d.

*States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Mandarino v. Pollard,* at 848. When a defendant is charged with wrongdoing, expends considerable resources to defend him or herself in court, and is awarded a final judgment, it is unfair to make that defendant then go through the whole process anew to defend the same actions that were attacked in the first suit. Yet this is a description of what the plaintiffs would have us sanction in this case.

If this is not a classic case of losing and trying again on a different theory, it is only because, as Judge Cudahy argues, the plaintiffs could not have brought their federal antitrust claim in state court. I agree with Judge Cudahy that this jurisdictional obstacle excuses the plaintiffs from bringing their federal claim in state court with their state claims, but it cannot excuse their waiting until their state suits were lost—a period of more than three years—before bringing their federal action. Insofar as the jurisdictional competency rule relied on by Judge Cudahy requires only that plaintiffs raise those theories of recovery available to them in a particular court—a court of their own choosing—and allows them to raise other theories at any other time, it is a technical rule that is not well designed to

serve the policies behind the doctrine of res judicata. I suggest that it is a better rule to require plaintiffs who are unable to bring their entire cause of action in the forum of their choice, such as the plaintiffs in this case, at least to bring their entire cause of action relatively contemporaneously, in order to avoid their having two successive "bites of the apple" at the expense of the defendant. In some cases plaintiffs may choose to bring their entire cause of action in federal court and attempt to have their state claims adjudicated under that court's pendent jurisdiction. In other cases plaintiffs may choose to split their cause of action between state and federal courts. Either course would be preferable to what the plaintiffs chose to do in the present case.

I do not suggest that requiring plaintiffs to bring their entire cause of action within a reasonable period of time would necessarily advance the interests of judicial economy, though I am satisfied that such a requirement would not increase the total volume of litigation.[6] This equitable requirement is simply one that is fair to defendants and at the same time poses no undue hardship on plaintiffs.[7] While this position represents an extension of the more confined and dated interpretations of res judi-

**6.** Of course, the requirement that is proposed may appear to be inefficient in a particular case where a plaintiff brings two contemporaneous suits and only one proves to be necessary to win a judgment. However, the same observation can be made about the res judicata doctrine generally, since it requires plaintiffs to present all possible theories of recovery when they may not all be necessary. That the res judicata doctrine is thought to promote judicial economy, *see Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979), reflects the belief that in the long run it is more efficient to consolidate closely-related matters at an early stage rather than run the risk of litigating each one separately over a long period of time. This belief seems equally relevant to the situation in the instant case. Moreover, requiring plaintiffs to bring their entire cause of action at approximately the same time would seem to promote judicial economy insofar as it creates some incentive for plaintiffs in cases such as this to bring their entire cause of action in federal court. In addition, to the extent that some plaintiffs still may wish to split their cause of action, requiring them to

split it contemporaneously rather than successively allows for some flexibility at the trial level that may reduce the amount of unnecessary litigation. For example, under certain circumstances an Illinois trial judge may dismiss a suit if there is another action between the same parties for the same cause pending in a different court, including a federal court. *See* 2–619(a)(3) of the *Illinois Code of Civil Procedure* (Ill.Rev.Stat., 1982, ch. 110, par. 2–619(a)(3)); *Skolnick v. Martin,* 32 Ill.2d 55, 203 N.E.2d 428 (1964). Similarly, in some situations the federal court may see fit to stay its proceedings under a doctrine of abstention. *See* 17 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction §§ 4241–4248 (1978).

**7.** I recognize that a plaintiff may have theories of recovery under state law that are less complex than his or her exclusively federal theories. In such a situation, a plaintiff may still proceed in federal court. Pendent jurisdiction could allow the plaintiff to litigate one or more of the state claims before others if a district judge is satisfied that such priority should be given.

cata,[8] it is in greater compliance with the spirit of the res judicata doctrine than are the more rote approaches. As the Supreme Court has stated, "[T]he doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and private peace,' which should be cordially regarded and enforced by the courts...." *Federal Department Stores v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981) (quoting *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 508, 61 L.Ed. 1148 (1917)). In this case, because the plaintiffs had an opportunity to litigate their federal antitrust claim in a court of competent jurisdiction and failed to do so until their other legal theories failed, they now should be equitably barred from bringing a federal antitrust suit.[9]

Because I find the plaintiffs' suit barred by res judicata, I deem it unnecessary and inappropriate to reach the discovery question raised in this case. It is essential, however, that the contempt issue be addressed. On that question, I agree with Judge Wood that the contempt citation should remain intact apart from the fact that the plaintiffs' suit has been barred by res judicata, and I join that portion of Judge Wood's opinion dealing with the viability of the contempt citation.

HARLINGTON WOOD, Jr., Circuit Judge, with whom CUMMINGS, Chief Judge, and CUDAHY, Circuit Judge, join, dissenting.

Judge Posner's opinion has eliminated some points which appeared in the two prior opinions in this case, now vacated, and has added some new points. In certain respects the changes make this latest version less objectionable, but I respectfully must dissent. Those two prior opinions created the impression that this court was trying the case on its antitrust merits before the case had much of a chance to get started in the trial court. That prejudgment pall still hangs heavy over Judge Posner's latest opinion. Judge Cudahy's opinion, with which I fully agree, addresses the res judicata issue. I discuss the discovery and contempt issue in this dissent to the discovery portion of Judge Posner's opinion. Perhaps we could have simply adopted Justice Stewart's dissents from the vacated panel decisions, but as this latest opinion has developed, we believe some elaboration is necessary.

First, a review of some basis discovery principles is in order. A criminal contempt citation is a final judgment subject to full rights of appeal. *United States v. Ryan,* 402 U.S. 530, 532, 91 S.Ct. 1580, 1581, 29 L.Ed.2d 85 (1971); *Union Tool Co. v. Wilson,* 259 U.S. 107, 111, 42 S.Ct. 427, 428, 66 L.Ed. 848 (1922). Appellate review of a criminal contempt judgment for failure to comply with a discovery order may be used to test the propriety of the underlying discovery order, which is not otherwise appealable. *Ryan,* 402 U.S. at 532, 91 S.Ct. at 1581; *Hanley v. James McHugh Construction Co.,* 419 F.2d 955, 957 (7th Cir.1969). The trial judge has wide discretion in shaping pretrial discovery. *Matter of Rassi,* 701 F.2d 627, 631 (7th Cir.1983). Reversal of a

---

**8.** It is worth emphasizing that this interpretation of the res judicata doctrine is limited to those cases in which one or more of the plaintiff's grounds for recovery can be litigated only in federal court, such as cases involving the federal antitrust laws. Where no such jurisdictional obstacle exists, it is already well settled that the plaintiff's entire cause of action must be brought contemporaneously, and in one court. *See* RESTATEMENT (SECOND) OF JUDGMENTS, § 25.

**9.** Although the fact that a plaintiff has actually lost an earlier suit involving the same cause of action should ordinarily be sufficient reason to invoke the res judicata doctrine, it is not essential that this occur. For purposes of applying res judicata, it may well be enough that a plaintiff has waited until the early stages of litigation are over in one suit before bringing the other, or that an unreasonable period of time has passed between the filing of the first and second suits. The reasonableness of the plaintiff's actions in a particular case should be a matter left to the sound discretion of the trial court that is being asked to bar the second suit on the basis of the res judicata doctrine.

discovery order is appropriate only upon a clear showing of abuse of discretion. *Voegeli v. Lewis,* 568 F.2d 89, 96 (8th Cir. 1977); *Keyes v. Lenoir Rhyne College,* 552 F.2d 579, 581 (4th Cir.1977), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977).

When a party objects to discovery of confidential information, the trial court must weigh the interests of the parties and of public policy to arrive at an appropriate discovery compromise. *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061–62 (7th Cir.1981) (per curiam); *Keyes,* 552 F.2d at 581. Generally, broad discovery is available under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 26(b)(1). Privileges excluding relevant evidence are construed narrowly because they constrict the fact-finding process. *Ryan v. Commissioner of Internal Revenue,* 568 F.2d 531, 542–43 (7th Cir.1977), *cert. denied,* 439 U.S. 820 (1978). Further, in the antitrust area, there is a strong public policy interest in open competition and private enforcement of the antitrust laws. *Memorial Hospital,* 664 F.2d at 1062. With these principles forming the backdrop, we now turn to analysis of the discovery order in this case.

The Academy claims that the confidentiality of its files is necessary to preserve asserted first amendment interests in the candid review of applicants for membership. I agree with Judge Posner's opinion that a first amendment argument for complete immunity from discovery is untenable. The freedom of association is not a shield against antitrust regulation. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 697, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978); *American Medical Association v. FTC,* 638 F.2d 443, 451–52 (2d Cir.1980), *aff'd by an equally divided court,* 455 U.S. 676, 102 S.Ct. 1744, 71 L.Ed.2d 546 (1982). This court recently acknowledged that a privilege against any discovery of even partially privileged materials might serve as a shield to hide evidence of illegal behavior and impair the truth-seeking process. *EEOC v. University of Notre Dame Du Lac,* 715 F.2d 331, 337 (7th Cir.1983).

In *Notre Dame,* which Judge Posner's opinion also cites, EEOC sought discovery of the University's tenure files to investigate an assistant professor's charge that he was denied tenure due to racial discrimination. This court recognized a qualified privilege against disclosure of the sources of documents in the University's tenure files, due to the critical role of confidential tenure review in the pursuit of academic excellence. Nevertheless, we sanctioned limited discovery using the technique of redaction of names and other identifying information. Judge Posner's opinion in the present case seems to accord the Academy as much or more protection than we gave the University in *Notre Dame.* The opinion, however, admits that the exact nature of the Academy is unclear. When we recognized the qualified academic freedom privilege in *Notre Dame,* we knew what we were protecting. Adlai Stevenson long ago put it well:

> For the university is the archive of the Western mind; it is the keeper of the Western culture and the foundation of Western culture is freedom. Men may be born free; they cannot be born wise, and it is the duty of the university to make the free wise. The university is the guardian of our heritage, the teacher of our teachers. It is the dwelling place of the free mind.

*Stevenson* (G. & D. Darling eds. 1977).

Nothing akin to the qualified academic freedom privilege applies to the Academy. The Academy, the only organization for this profession that counts as members nearly all the orthopaedic surgeons in the United States, does not claim to license, certify, or police the profession. Indeed, membership in the Academy appears to be most conspicuous by its mere absence. Yet the Academy itself fluctuates on the importance of membership. When an anti-competitive group boycott is the topic, the Academy gives the impression that exclu-

sion from its ranks is of little professional consequence. In support of this characterization, the Academy argues that one of its principal functions is to sponsor educational seminars to which even non-members are welcome. However, when discovery of its admissions files is the issue, the Academy views itself as much too important to allow its confidentiality to be disturbed.

Judge Posner's opinion, by bestowing on the Academy some new kind of privilege in the nature of a first amendment interest, seems to agree with the Academy that its files are almost sacrosanct. All variety of trade associations and other types of organizations, from civic clubs to country clubs, should rejoice in their improved status and newly-fashioned protection from troublesome inquiries. Individuals and agencies, however, who have legitimate antitrust, discrimination, and other claims against such organizations have little reason to rejoice.[1]

Rather than following the *Notre Dame* redaction model in a context not involving the academic freedom privilege, the district court chose to protect the confidentiality of Academy documents by ordering production of the unredacted files on rejected applicants for membership, but with restrictions on disclosure of the contents. Plaintiffs' attorneys were to be permitted to discuss with their clients only the general contents, without identifying sources, of the files on other disappointed applicants. The files were to be used solely for purposes of this litigation. In reaching the discovery compromise, the district court followed the path approved by this court in *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058 (7th Cir.1981) (per curiam).

An asserted freedom of association does not raise a privilege against all discovery in the early stages of antitrust litigation, but requires a balance of the interests in confidentiality and disclosure to reach a discovery compromise. The trial judge endeavored to achieve that balance by working with the parties. I believe that the discovery order reasonably protected the Academy's confidentiality interests to at least a minimum extent while granting plaintiffs access to information without which, both Judge Posner's opinion and the district court agree, they probably would be foreclosed from proving their case.

Judge Posner's opinion now finds fault in the district court's failure to incorporate other protective devices for resolving the discovery dispute, such as an in camera inspection of the Academy's files or production of a redacted version of the files. I, too, believe that the trial judge could have improved on his discovery order. First, he could have been well-served by taking a look in camera at the Academy files on plaintiffs to see whether the files contained what plaintiffs claimed to need so badly, and whether the Academy had good reason to fight so desperately to keep the files out of sight.

The Supreme Court has commended an in camera view of documents in a discovery dispute to insure the striking of a proper balance between the interests in confidentiality and disclosure. *Kerr v. United States District Court,* 426 U.S. 394, 405, 96 S.Ct. 2119, 2125, 48 L.Ed.2d 725 (1976). Failure to make an in camera inspection, however, is not in itself an abuse of discretion. While the district court did not view the Academy's files, it apparently was aware that the state trial court had conducted an in camera inspection of the files in the earlier state court litigation between the same parties. After viewing the files,

1. In response to this dissent, Judge Posner's opinion has been revised in an attempt to narrow the reach of its holding on discovery of membership files by limiting it to professional associations, and not even all of those. A narrower holding may be some improvement, but the mere statement that the holding is so limited does not make it so.

Judge Posner's opinion labels the Academy's confidentiality concerns, "if not a First Amendment right, at least a First Amendment interest." We now are left in considerable doubt about which associations may qualify as beneficiaries of this first amendment protection, and what criteria should be used to distinguish among them. As a result, we surely will see additional problems created. Therefore, the concerns expressed by this dissent remain valid.

the state court ordered production over the Academy's objections. *Treister v. American Academy of Orthopaedic Surgeons,* 78 Ill.App.3d 746, 748, 33 Ill.Dec. 501, 503, 396 N.E.2d 1225, 1226 (1st Dist.1979) (describing the trial court's action). Thus, one judge had viewed these materials and determined that the contents were relevant and disclosure was appropriate. We should not ignore the state court's first-hand determination. Further, the Academy has maintained that an in camera inspection would not improve the discovery order. In the Academy's view, as I understand it, an in camera inspection could lead to a discovery order which, even if including redaction of the files, would be an abuse of discretion at this stage of the litigation.

The propriety of the district court's order to produce the unredacted files also must be considered in light of the surrounding circumstances. In the early stages of this litigation, plaintiffs expressed their willingness to accept a redacted version of the Academy's files, at least as the first phase of discovery. The Academy refused plaintiffs' early offer to enter a redaction agreement, and plaintiffs later rescinded the offer. Both sides submitted proposed protective orders to the district court; apparently neither provided for redaction.

The Academy's participation in later court proceedings suggested its general approval of the protective order as it was developing. However, the Academy meanwhile continued to press its effort to avoid any discovery of its files. At oral argument, counsel for Dr. Treister stated that his client now would accept a redaction order if this would not limit the right to seek sanctions against the Academy. The Academy's position at oral argument was that any disclosure of its files, even after excision of names and other identifying information, would enable plaintiffs to determine the source of comments, thereby chilling participation in the Academy's admissions process. The Academy steadfastly maintained that no modification of the district court's protective order would be acceptable to it, and any forced disclosure of confidential information prior to the estab-

lishment of a jury issue on antitrust injury would be an abuse of discretion. Although the Academy's stonewalling now has paid off, I do not find an abuse of discretion in the district court's failure to order redaction under these circumstances.

Judge Posner's opinion suggests that the district court should have used its Rule 26(d) powers to control the sequence of discovery in this case. Discovery usually may proceed in any sequence, but the court upon motion, for the convenience of parties and in the interests of justice, may schedule the order of discovery on different issues. Fed.R.Civ.P. 26(d). Judge Posner's opinion correctly notes that the district court's power to order sequential discovery may rise to a duty in some cases, citing *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980), a reporter's privilege case. The present case does not begin to fit into the *Bruno & Stillman* mold. The interests in the confidentiality of the Academy's files do not require such delicate treatment as do those involved in the case of a reporter seeking to protect confidential news sources from discovery. The district court considered and rejected the Academy's motion to bifurcate discovery. The court was satisfied that plaintiffs' claim was not frivolous, having withstood a motion to dismiss once, and again upon reconsideration. The Academy's proposal for sequential discovery would have required piecemeal discovery, which the district court found would burden plaintiffs unnecessarily since the Academy's confidentiality interests could be preserved adequately through a protective order. I would hold that the district court did not abuse its discretion by refusing to order sequential discovery.

Judge Posner's opinion discusses the misuse of discovery tools to coerce settlement, and apparently concludes that the district court's discovery order failed to prevent plaintiffs from abusing the discovery process. The opinion finds two "hints" of predatory discovery here: first, that plaintiffs sought access to federal court—and its liberal discovery rules—only after losing in the state court; and further, that plaintiffs

planned to use information from the Academy's files as the basis for further discovery. The first hint merely returns us to the res judicata issue in the context of a dual court system. The second hint, plaintiffs' plan to follow up leads found in the files, is one of the conventional purposes of discovery.

Upon questioning at oral argument, counsel for the Academy labeled plaintiffs' suit a "fishing expedition," an attempt to gain access to otherwise unavailable information. Under the circumstances, however, plaintiffs' pursuit of the files and plan to seek further discovery using leads from the files were within the bounds of appropriate discovery. The discovery record in this case evidences not the slightest abuse, harassment, or coercion to pressure a settlement. Judicial concern about discovery abuse is always legitimate, but such arguments are gratuitous in the context of this case. The abuse of discovery here instead is the Academy's obstinate defiance of the trial court, which now is sanctioned by this court.

Although not condemning any one omission as an abuse of discretion, the discovery majority is left with the "firm conviction" that the district court's discovery order was erroneous. I am not. The district court sought and received proposed protective orders from the parties, and mediated negotiations on this issue. Bifurcation of discovery was not mandatory in this case, and the court reasonably provided for the Academy's confidentiality concerns through the protective order. The Academy should not now reap a windfall from reversal of the discovery order because the order did not incorporate certain provisions that the Academy still would refuse to accept. The Academy treated the trial judge's reasonable discovery order with contempt and its contempt should be recognized by this court.

The Academy further objects to the contempt penalty. It argues that the $10,000 fine invoked the right to a jury trial, and the court erred in not granting a jury trial on the contempt adjudication. The Academy also challenges the fine as excessive in view of the nature of the offense.

The right to a jury trial for a charge of criminal contempt arises when the penalty imposed exceeds what would be considered a petty offense under the statutory definition of federal criminal offenses. *Frank v. United States,* 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); *Cheff v. Schnackenberg,* 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966). A petty offense is any misdemeanor for which the penalty does not exceed six months' imprisonment or a $500 fine. 18 U.S.C. § 1(3). The $10,000 penalty against the Academy obviously exceeds the $500 limit for petty offenses, and was imposed without a jury trial. Plaintiffs argue, however, that the Academy waived its right to a jury trial. The development of the contempt citation in this case convinces me that such a waiver did take place and that the amount of the fine was not an abuse of discretion. *See Shibley v. United States,* 236 F.2d 238, 240 (9th Cir.1956), *cert. denied,* 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 77 (1956) (abuse of discretion standard of review); *Jewel Tea Co. v. Kraus,* 204 F.2d 549, 551 (7th Cir.1953) (same).

In the presence of all parties, the district court and the Academy discussed possible avenues for the Academy to procure appellate review of the discovery order, after this court had dismissed an earlier appeal attempt for lack of jurisdiction. The Academy suggested that the court hold it in criminal contempt with a fine of $500, and waived issuance of a rule to show cause. Plaintiffs, desiring to coerce production, proposed a civil contempt citation with a daily $5,000 fine. A few days before entering the contempt order, the district court informed the parties of its intention to impose, as a compromise, a criminal contempt citation with a one-time $10,000 fine. After the district court informed the Academy of its draft order, the Academy did not object or attempt to rescind its waiver of a rule to show cause; nor did it assert its right to a jury trial. Rather, the Academy appeared willing to accept the citation and fine as the basis for an appeal to this court,

and risk paying the price. It is now too late for the Academy to become parsimonious.

Judge Posner's opinion declines review of the contempt citation under a belief that the citation falls with reversal of the district court either on res judicata grounds or for abuse of discretion in shaping the discovery order. The status of a contempt citation after reversal of the underlying order is an issue independent of the propriety of reviewing the underlying order on appeal of the contempt citation. On the latter issue, which I have discussed above, I agree with Judge Posner's opinion that review of the underlying discovery order is appropriate here. On the former issue, however, the opinion cites yet overlooks precedent which supports sustaining the contempt order despite reversal of the district court order on other grounds.

As Judge Posner's opinion notes, many decisions hold that a contempt citation remains intact even after invalidation of the underlying court order which was violated. *See, e.g., Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 590–91, 42 L.Ed.2d 574 (1975); *United States v. United Mine Workers of America,* 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed. 884 (1947). *See also Blocksom and Co. v. Marshall,* 582 F.2d 1122, 1124 (7th Cir.1978) ("it is no defense to a charge of criminal contempt that the order disobeyed was invalid"). The Court in *United Mine Workers* concluded:

> [W]e find impressive authority for the proposition that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly proceedings. This is true without regard for the constitutionality of the Act under which the order is issued.... Violations of an order are punishable as criminal contempt even though the order is set aside on appeal.

*Id.* 330 U.S. at 293–94, 67 S.Ct. at 696 (footnotes omitted).

The district court had both subject matter and personal jurisdiction in this action. Even if the action is barred by res judicata, this is not a jurisdictional deficiency; res judicata is an affirmative defense that may be pleaded and proved, or waived, by the party asserting it. *See, e.g., Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971); *Church of the New Song v. Establishment of Religion on Taxpayers' Money in the Federal Bureau of Prisons,* 620 F.2d 648, 651 (7th Cir.1980), *cert. denied,* 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981); Fed. R.Civ.P. 8(c). *See also* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4405 (1981). The criminal contempt citation against the Academy remains very much alive. The district court's jurisdiction was uncontested. The court entered a discovery order which the Academy chose to disobey. The Academy itself invited the contempt citation which has enabled it to perfect this appeal.

Although the discovery order could have been improved, the district court's fashioning of the terms was not an abuse of discretion under the circumstances of this case. What the merits of this case would have turned out to be, we now will never know; but we must not let a prejudgment on the merits cloud our review of the discovery order. Plaintiffs, their case not barred by res judicata, deserve the opportunity within reasonable limits to develop their case, and then the opportunity to try it before a judge and jury. I would affirm the district court's contempt holding, but on remand I would direct the court to view the Academy's files in camera and to consider possible redaction before actually enforcing the discovery order.[2] This opportunity to reconsider the discovery order would be a fairer disposition of this case, giving the Academy another chance to review its posi-

---

2. This is not to say that the trial judge abused his discretion in the manner in which he afforded protection to the Academy. I would affirm his discovery order. I suggest only that, in light of all the judicial discussion of the issue, the trial judge, before again attempting to enforce his discovery order, reconsider whether or not he could improve upon his original order after an in camera sampling of the files.

tion on discovery without depriving plaintiffs of their chance to see if they can make out a case.

Judge Posner's opinion reaches the discovery issue despite its conclusion that the suit should be dismissed on res judicata grounds. The opinion directs that plaintiffs' complaint be dismissed with prejudice. That is a hard blow to strike, particularly when paving new ground in the res judicata area. I have no reservations about joining Judge Cudahy's opinion on the res judicata issue, and I respectfully dissent on the discovery and contempt issue.

CUDAHY, Circuit Judge, with whom CUMMINGS, Chief Judge, and HARLINGTON WOOD, Jr., Circuit Judge, join, dissenting.

I join enthusiastically in Judge Wood's able dissent on the discovery branch of this case while, at the same time, I write separately in dissent principally on the plurality's [1] res judicata holding.

We are presented here with a Sherman Act claim against what may for present purposes be characterized as a dominant national trade association.[2] As Illinois Supreme Court Justice Seymour Simon, then of the Illinois Appellate Court, has said,

[Dr. Treister] seeks admission to a prestigious medical society, not to a social, religious, or fraternal organization like an Elks Club ... or the Order of the Eastern Star.... The Academy holds itself out as the sole legitimate organization of its kind in the profession, and is widely recognized as such. It is a monopoly; and it is affiliated with the A.M.A., itself a monopoly.... The Academy is more like a government than like a truly voluntary combination, and may justly be treated accordingly.

*Treister v. American Academy of Orthopaedic Surgeons,* 78 Ill.App.3d 746, 759-67, 33 Ill.Dec. 501, 600, 602, 605, 396 N.E.2d 1225, 1234, 1236, 1239 (1979) (Simon, J., dissenting).

When a large national organization with a membership including the vast majority of the board-certified orthopaedic surgeons of the country conducts its affairs, one may assume that its interests cover the gamut of economic, as well as medical, concerns of the membership.[3] Whatever differences may otherwise exist, at least for antitrust purposes, the Academy seems comparable with other great national trade or professional associations such as the American Bar Association, the Cement Manufacturers Protective Association [4] and the American Iron and Steel Institute.[5]

I wonder whether the majority would extend the solicitude which it feels for the secret files of the Academy if one of these other trade associations were the defendant. I see no reason why the principles announced here would not apply equally to such a case. I believe the Academy is more like the American Iron and Steel Institute—both organizations are comprised of the practitioners of a particular trade, business or profession (who are potential com-

1. The opinion authored by Judge Posner is a majority opinion on the validity of the discovery order but a plurality opinion with respect to the res judicata issue. Therefore, as the context requires, I shall variously refer to this opinion as the majority or plurality opinion.

2. *See* note 5 *infra.*

3. In 1976, the Academy entered into a consent decree with the Federal Trade Commission, prohibiting the Academy's further compilation or publication of "relative value scales" for pricing its members' services. (R. 86, pp. 2–3 and Reference Exhibit). The FTC apparently contended that this activity of the Academy constituted a form of price-fixing. 88 F.T.C. 968 (1976).

4. *See generally Cement Manufacturers Protective Association v. United States,* 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925).

5. The majority quarrels with my characterization of the Academy as a "trade association." As noted *infra,* it is certainly one, *prima facie,* since the membership is defined by the occupation of the members—orthopaedic surgery. What it is *exactly* cannot be known at this early stage of the proceedings. I do not question the Academy's commitment to superior medical care, professional enlightenment and education.

petitors)—than the Academy is like the National Association for the Advancement of Colored People. Yet the majority discusses *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), as if it had significant bearing on the case at bar. *Supra,* at 1159. The NAACP, like the John Birch Society, is an advocacy organization, having occupationally diverse members committed to the same (relatively controversial) ideas and causes. First amendment concerns with respect to such organizations are obvious. The members of the Academy, on the other hand, have in common, like other trade groups, their occupation, business or profession. Like other such groups, the Academy presumably promotes the betterment and serves the occupational interests of its members.

The majority cites no case which recognizes any "interest" under the first amendment, or its penumbra, in secret proceedings of trade or professional associations. At oral argument, counsel for defendants indicated that the same secrecy interest belongs to all private organizations—including country clubs. I believe there are serious dangers in recognizing substantial rights to secrecy in organizations which bring together members of the same trade, occupation or profession, where no legal privilege exists. *Cf. Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058 (7th Cir.1981) (per curiam). When people who make their living in the same way join together—however exalted their purposes—it is the height of naivete to suggest that their association is without economic significance. Certainly the antitrust laws have never indulged in any such unrealistic assumption. As Justice Simon has said:

> The secrecy in which ... associations [like the Academy] have historically cloaked themselves is therefore little proof of its value for legitimate purposes, and is open to sustained abuse....

> [T]he power of groups like the Academy is so great, so self-perpetuating, so little checked by private forces, and has such potential for abuse, that the balance of interests favors judicial oversight.

78 Ill.App.3d at 766, 33 Ill.Dec. at 605, 396 N.E.2d at 1239 (Simon, J., dissenting). In this connection I note that our recent decision in *EEOC v. University of Notre Dame Du Lac,* 715 F.2d 331, 340 (7th Cir.1983), involving the confidentiality of peer review documents, specifically recognized a qualified academic freedom privilege.[6]

The plurality, with Judge Flaum concurring, has, however, seen fit to dispose of this case not primarily on the basis of the right to secrecy but rather on grounds of res judicata. At least the plurality describes the grounds of its ruling as "res judicata," although the application here is hardly recognizable in terms of the well accepted principles of that doctrine. The plurality concedes that, as Justice Potter Stewart noted in his dissent from the first panel opinion, *Marrese v. American Academy of Orthopaedic Surgeons,* 692 F.2d 1083, 1099 (7th Cir.1982) (Stewart, J. (Retired), dissenting), *reh'g granted* and *vacated* (1983), the overwhelming weight of authority is against it. *See, e.g., Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 274 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Hayes v. Solomon,* 597 F.2d 958, 984 (5th Cir.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Kurek v. Pleasure Driveway & Park District of Peoria,* 583 F.2d 378, 379 (7th Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979); *Abramson v. Pennwood Investment Corp.,* 392 F.2d 759, 762 (2d Cir.1968). The plurality opinion is in fact an aggressive *tour de force*—going well beyond existing law—in the abdication of federal jurisdiction.

---

**6.** At oral argument, counsel for the defendants expressly disclaimed any function of professional self-regulation (like peer review) for the Academy. Yet Justice Simon has said that "[t]he Academy functions largely as an informal accrediting body .... [T]he main advantage of membership appears to be the credential, the Academy's endorsement, relied on by others." 78 Ill.App.3d at 765, 396 N.E.2d at 1238 (Simon, J., dissenting).

Since the plurality opinion seems to take us so far from the *terra firma* of solid precedent and facts of record, let us first turn to fundamentals. An old and honored formulation of the res judicata defense in barring a subsequent suit is that "a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies . . . ." *Southern Pacific Ry. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). *See also Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979). The plurality opinion, however, does away with the requirements that there be identity of causes of action and that the first judgment be rendered by a court jurisdictionally competent to hear the claim which is later held to be barred.

This is judicial activism in the service of judicial abdication. We are told, in effect, that state and federal courts are busy, and it will save everyone's time if the plaintiffs are refused the right to bring their Sherman Act claim in the only court which can hear it. It would surely save us even more time if the federal courts refused to hear all claims on the theory that the state courts could hear ones that are similar. With all respect, I am afraid we are simply refusing to do our job as federal judges in circumstances where the well-accepted rules plainly require us to do it.

In determining when to apply res judicata, the plurality opinion formulates a new "federal rule" that a federal court should give a prior state court judgment greater preclusive effect than would a state court. But the federal courts, in fact, are bound under the "full faith and credit" clause of the Constitution and 28 U.S.C. § 1738 to give the *same* res judicata effect to a prior state court judgment as would another court of that same state. In this situation, "more" is clearly not "better." The plurali-

ty does concede that a federal antitrust claim could not arise in state court and that therefore the outcome of such a scenario could not specifically decide the case before us. Nonetheless, because the plurality continues to advocate a "federal rule" which would be more preclusive than state practice, it is appropriate for me to address the reasons why a state law test should govern.

The plurality's new rule is contrary to section 1738 as well as to the purposes underlying "full faith and credit." As Justice White has written,

> [i]t has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken.

*Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262 (1982). This is the Court's understanding of Congress' intent and the *Kremer* holding reflects the plain command of section 1738.[7]

> The plurality, however, argues that section 1738 ought not prevent a federal court from giving a state judgment *more* effect in a federal suit than the courts of the state would give it in a state suit. A federal court does not undermine the authority of a state's courts when it holds that a state judgment bars a federal suit.

*Supra,* at 1154 (emphasis in original) (citations omitted). Most of the authority cited by the plurality for this proposition does not specifically discuss this issue and predates the two recent Supreme Court decisions, *Kremer* and *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), which do address the issue. The plurality also cites *Federal Deposit Insurance Corp. v. Eckhardt,* 691 F.2d 245 (6th Cir.1982), which in fact holds that the preclusive effect of a prior judgment is determined by the law of the rendering forum (in that case, the state

---

7. *See also Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (§ 1738 requires "all federal courts to give pre-

clusive effect to state court judgments whenever the courts of the state from which the judgments emerged would do so . . .").

of Ohio). The Sixth Circuit emphasized the new trend supporting this holding, in stating, "the emerging rule is that the preclusive effect of a valid judgment is to be determined by the law of the system which rendered the judgment." *Id.* at 247. *See also General Foods Corp. v. Massachusetts Department of Public Health,* 648 F.2d 784 (1st Cir.1981). A perceptive commentator has recently endorsed this modern trend:

> A different rule is emerging today, and an even stronger one will prevail in the future. It will read something like this:
>
> *A valid judgment rendered in any judicial system within the United States must be recognized by all other judicial systems within the United States, and the claims and issues precluded by that judgment, and the parties bound thereby, are determined by the law of the system which rendered the judgment.*

Degnan, *Federalized Res Judicata,* 85 YALE L.J. 741, 773 (1976) (emphasis in original).

In addition to the recent authority contradicting the plurality's proposed rule, there are important policy considerations which also militate against it. Deference to state courts is not the *only* value to be served by the res judicata doctrine. Even the commentator whom the plurality opinion cites approvingly recognizes that there are other values at stake when making a res judicata determination:

> [T]his reading of section 1738 [to allow greater preclusive effect] might offend state policies limiting the res judicata effect of judgments, and there may be due process problems in giving a judgment greater effect than the court entering it intended . . . .

Currie, *Res Judicata: the Neglected Defense,* 45 U. CHI.L.REV. 317, 327 (1978). The plurality has thus overlooked the policy interests of the rendering forum in predicting the preclusive effect of its own judgments. In addition, by rejecting the Illinois law of res judicata in the guise of improving upon it, the plurality has undermined the Illinois law to which it purports to defer.

The significance of section 1738 and its interpretation in *Kremer* is that a federal court, in determining the res judicata effect of a prior state court judgment, should apply the criteria of the state's res judicata law. It would be incorrect to limit the question strictly to the outcome of a federal antitrust claim in state court because, as the plurality concedes, such a suit would be dismissed for lack of jurisdiction. *Kremer* still dictates, however, that the appropriate issue is the application of the *principles* of Illinois res judicata law to the current case.[8]

---

**8.** Plaintiffs argue that an Illinois court would not bar a second suit based on the *Illinois* antitrust laws because Illinois courts employ a different test (based on similarity of evidence) to determine identity of causes of action. *See Village of Northbrook v. County of Cook,* 88 Ill.App.3d 745, 750, 43 Ill.Dec. 792, 796, 410 N.E.2d 925, 929 (1980); *Olson v. Olson,* 114 Ill.App.3d 28, 69 Ill.Dec. 769, 772, 448 N.E.2d 229, 232 (1983); *Hilti, Inc. v. Griffith,* 68 Ill.App.3d 528, 532–33, 24 Ill.Dec. 859, 861, 386 N.E.2d 63, 65 (1978); *Rotogravure Serv. v. R.W. Borrowdale Co.,* 77 Ill.App.3d 518, 525, 32 Ill.Dec. 762, 767, 395 N.E.2d 1143, 1148 (1978); Treister Supplemental Brief at 10–18. I do not believe it is necessary here to consider the outcome under this similarity of evidence theory of such a suit in state court because this determination is not necessary to the conclusion that plaintiffs' federal antitrust claim should not be barred in federal court. I note in passing, however, that in the decision cited by the plurality, *Federal Deposit Insurance Corp. v. Eckhardt,* 691 F.2d 245 (6th Cir.1982), the

Ohio res judicata law applied by the Sixth Circuit involves a test which is close to that suggested by the plaintiffs as appropriate in Illinois: the existence of "a single or two distinct causes of action for res judicata purposes [is determined by] '[w]hether different proofs are required to sustain the two actions . . . .'" *Id.* at 248 (quoting *Norwood v. McDonald,* 142 Ohio St. 299, 311, 52 N.E.2d 67, 73 (1943)).

Further, if plaintiffs had appended a state antitrust claim to their federal antitrust claim brought in federal court, the federal court would evaluate the federal claim under the plurality's new federal rule, while it would have to evaluate the state claim under Illinois res judicata law in accordance with the Rules of Decision Act, 28 U.S.C. § 1652, and the *Erie* doctrine. Vestal, *Res Judicata/Preclusion by Judgment: The Law Applied in Federal Court,* 66 MICH.L.REV. 1723, 1728–31 (1968). This analysis could then lead to the anomalous result that the federal claim was precluded by the state court judgment but the state claim was not.

Illinois res judicata law thus requires that, in order to bar a subsequent claim which was not raised in the first suit, the first court must have had jurisdiction to hear the subsequent claim.

> The doctrine of *res judicata* provides that a final judgment *rendered by a court of competent jurisdiction* on the merits is conclusive as to the rights of the parties and their privies, and as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action. (*People v. Kidd* (1947), 398 Ill. 405, 408, 75 N.E.2d 851).

*Rotogravure Serv. v. R.W. Borrowdale Co.,* 77 Ill.App.3d 518, 524, 32 Ill.Dec. 762, 767, 395 N.E.2d 1143, 1148 (1978) (emphasis supplied).[9] Apparently, no Illinois judge has questioned the jurisdictional competency rule; any departure from the rule has presumably been deemed so unfair and illogical as to require no discussion. Therefore, because the Illinois courts did not have jurisdiction to hear the plaintiffs' Sherman Act

antitrust claim, the prior Illinois suit cannot bar the subsequent federal suit.

Turning from state law, I shall now examine the plurality's suggestion that the plaintiffs' federal antitrust claim, as a matter of *federal* law, should be barred in federal court because they should have brought either a federal or a state antitrust claim in state court simultaneously with their common law claims.[10] However, a federal antitrust claim brought in an Illinois court would certainly have been dismissed for lack of jurisdiction. The plurality laments the fact that federal courts have long asserted exclusive jurisdiction under the federal antitrust statutes. *Blumenstock Bros. Advertising Agency v. Curtis Publishing Co.,* 252 U.S. 436, 440, 40 S.Ct. 385, 386, 64 L.Ed. 649 (1920); *Kurek v. Pleasure Driveway & Park District,* 583 F.2d 378 (7th Cir.1978). Ultimately, however, the plurality acknowledges that this court, even in the course of its more creative efforts at narrowing its own powers, must accept this rule as a given.[11]

---

9. *See also Schmitt v. Woods,* 73 Ill.App.3d 498, 499, 29 Ill.Dec. 498, 499, 392 N.E.2d 55, 56 (1979); *Hilti, Inc. v. Griffith,* 68 Ill.App.3d 528, 532, 24 Ill.Dec. 859, 861, 386 N.E.2d 63, 65 (1978); *Kahler v. Don E. Williams Co.,* 59 Ill. App.3d 716, 718, 16 Ill.Dec. 927, 929, 375 N.E.2d 1034, 1036 (1978); and *National Tea Co. v. Confection Specialties, Inc.,* 48 Ill.App.3d 650, 654, 362 N.E.2d 1150, 1153 (1977).

10. The plurality says that the plaintiffs "waited till they had lost their state law suits and only then ... did they bring suit." *Supra,* at 1152. This is certainly not true of Dr. Marrese, whose state court action was not dismissed until approximately one year after the filing of the federal action. Marrese's Petition for Rehearing at 7. In the case of either plaintiff, however, it is unclear what aspect of judicial economy or fairness to the defendant would have been served by requiring even the simultaneous filing of both actions in state and federal courts.

11. The plurality opinion refers to the preclusive effect of a prior state court adjudication of an antitrust *defense, supra,* at 1153, in arguing that this court should adopt the same rules for an antitrust *claim.* Yet, in the decision which the plurality cites, *Lyons v. Westinghouse Electric Corp.,* 222 F.2d 184 (2d Cir.1955), Judge Learned Hand refused to grant preclusive effect to a state court adjudication of such a defense. Judge Hand wrote:

the grant to the district courts of exclusive jurisdiction over the action for treble damages should be taken to imply an immunity of their decisions from any prejudgment elsewhere; at least on occasions, like those at bar, where the putative estoppel includes the whole nexus of facts that makes up the wrong.

*Id.* at 189. The *Lyons* decision is usually taken to stand for a principle precisely opposite to that for which the plurality cites it, namely, "that state court determination of a federal antitrust defense in a contract action could not become binding in federal antitrust litigation." 18 C. Wright, A. Miller, E. Cooper, Federal Practice And Procedure § 4470, at 683 n. 23 (1981). *See also RX Data Corp. v. Department of Social Services,* 684 F.2d 192, 196–98 (2d Cir.1982) (court declined to apply either res judicata or collateral estoppel when there was insufficient identity of issues, partly because state court could not have heard claim for copyright infringement).

The plurality also relies on Justice Holmes' decision in *Becher v. Contoure Laboratories, Inc.,* 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929), as authority for granting preclusive effect to a prior state court proceeding. In *Becher,* the federal suit involved a claim of patent infringement, while the prior state decision related to a breach of contract claim. Holmes held that the plaintiff was estopped to relitigate the state court's *findings of fact,* even though

In his dissent from the first panel decision in this case, Justice Stewart observed that the federal common law of res judicata bars the relitigation of all those claims—but only those claims—which were *or could have been* brought in a prior litigation between the same parties arising from the same cause of action. As the Supreme Court said in *Federated Department Stores v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981):

> There is little to be added to the doctrine of res judicata as developed in the case law of this Court. A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Commissioner v. Sunnen,* 333 U.S. 591, 597 [68 S.Ct. 715, 719, 92 L.Ed. 898] (1948); *Cromwell v. County of Sac,* 94 U.S. 351, 352–353 [24 L.Ed. 195] (1877).

*Id.* at 398, 101 S.Ct. at 2428.

By definition, the "could have been raised" standard necessarily entails the jurisdictional competency of the court that decided the prior litigation to rule on the merits of any such possible other claims. Sherman Act claims are within the exclusive jurisdiction of the federal courts; they simply cannot be brought in the courts of Illinois.

The plurality also raises the possibility that the plaintiffs, unable to bring their federal claim in state court, should have brought a *state* antitrust claim. The plurality argues that the alleged *near* identity of such a state antitrust claim with a Sherman Act claim should bring into play the application of res judicata to the present federal claim. Never in recent times—with only one exception—has a federal court held a federal antitrust claim barred by the availability or actual prosecution of a state antitrust action.[12]

The plurality rejects the myriad precedents against a state action as a bar ostensibly because most of these decisions predate the Fourth Circuit's departure from this

---

these facts might be dispositive of the patent claim. Exclusive federal jurisdiction over patents did not prevent the state court from determining facts relevant to the dispute before it:

> A fact is not prevented from being proved in [a state] case in which it is material, by the suggestion that if it is true an important patent is void—and ... we can see no ground for giving less effect to proof of such a fact than to any other.

*Id.* at 391–92, 49 S.Ct. at 357.

It is clear that the holding in *Becher* was limited to the preclusive effect of *findings of fact.* As the Sixth Circuit, in *Cream Top Creamery v. Dean Milk Co.,* 383 F.2d 358 (6th Cir.1967), explained the *Becher* holding:

> Thus if the first suit is brought in a State Court, this will not mean necessarily that facts there proven can be contested subsequently in a Federal Court action, notwithstanding the exclusive jurisdiction of the Federal Court. However, the doctrine of collateral estoppel is not applicable in the instant case where there were no findings of fact and no adjudication of the case on its merits in the State Court action.

*Id.* at 362–63.

As the court in *Cream Top Creamery* stated, so in our case—there have been no *findings of fact* in the state court. The plurality concedes that the decision in *Lyons* is restricted to the preclusive effect of prior determinations of facts. Nonetheless, the plurality continues to rely heavily on the holdings in *Lyons* and *Becher* to support its argument that nonfactual issues should be precluded in the present case. Yet *Lyons* even refers to the distinction between individual facts and a group of operative facts involving the application of law. *See also Abramson v. Pennwood Investment Corp.,* 392 F.2d at 762 (complaint based on Securities Exchange Act § 10(b) and Rule 10b–5 not barred under res judicata by prior state court action based on claim of breach of fiduciary duty although plaintiff would be estopped to relitigate *facts* determined in prior proceeding). In the case before us, there have simply been no findings of fact to estop the plaintiffs in federal court, and the plurality's citations are not on point.

12. At least five circuits including this one have expressly adopted the rule that the availability of a state claim does not bar a federal suit based on a federal statute over which the federal courts have exclusive jurisdiction. *See Hayes v. Solomon,* 597 F.2d 958, 984 (5th Cir. 1979); *Kurek v. Pleasure Driveway & Park District of Peoria,* 583 F.2d 378, 397 (7th Cir. 1978); *Clark v. Watchie,* 513 F.2d 994, 997 (9th Cir.1975), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975); *Abramson v. Pennwood Investment Corp.,* 392 F.2d 759, 762 (2d Cir.1968); *Cream Top Creamery v. Dean Milk Company, Inc.,* 383 F.2d 358, 362–63 (6th Cir. 1967).

rule in *Nash County Board of Education v. Biltmore Co.,* 640 F.2d 484 (4th Cir.1981). In the one decision subsequent to *Nash,* the Ninth Circuit declined to follow the Fourth Circuit decision since it was easily distinguishable. *Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 818 n. 1 (9th Cir.1982), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). However, the RESTATEMENT (SECOND) OF JUDGMENTS is explicit on the very problem presented in *Nash* and in the case before us.

> A Co. brings an action against B Co. in a state court under a state antitrust law and loses on the merits. It then commences an action in a federal court upon the same facts, charging violations of the federal antitrust laws, of which the federal courts have exclusive jurisdiction. The second action is not barred.

RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c) comment c, illustration 2 (1982).[13]

In *Nash,* the single modern exception to the rule that a state action cannot bar a Sherman Act claim, the plaintiff school board attempted to bring a federal antitrust claim. This claim was held to be barred by res judicata because of an earlier state antitrust claim prosecuted by the state attorney general—a privy of the plaintiff. Very importantly for the equities of the matter, the earlier case had been settled with a consent decree accepted by all parties to the litigation. In holding that the federal suit was barred, the court also noted that the North Carolina antitrust statute was *identical* to the comparable federal statute except for the latter's requirement of involvement in interstate commerce. 640 F.2d at 490.

There are at least four persuasive reasons for refusing to follow *Nash.* First, the *Nash* court used language apparently recognizing that the court hearing the first claim must have had jurisdiction to hear the

second claim before res judicata could be applied. Nonetheless, in holding that the state antitrust claim barred the federal claim, the *Nash* court in effect eliminated this jurisdictional competency requirement from the res judicata formulation which the Supreme Court had once again made explicit in its 1981 decision, *Federated Department Stores, supra.* The *Nash* court thus misconstrued the Supreme Court's res judicata formulation in *Montana* and *Federated Department Stores* and went on to base its analysis on the incorrect thesis that an exclusively federal action and a state court action could ever be the same "cause of action" and that the latter could thereby bar the former.

Second, the special and strong equities of *Nash* induced the Fourth Circuit to overlook overwhelming federal and other authority, as well as crucial and long-honored policies. *Nash* is a hard case that has made bad law. The plurality here fails to note that the first lawsuit in *Nash* had been terminated by a settlement and a consent decree involving the very antitrust allegations that formed the basis of the federal suit. This presented the strongest possible equitable case for claim preclusion against a subsequent federal treble damages antitrust action brought by a party in privity.[14] The termination of the first lawsuit by a settlement and consent decree is the true rationale underlying the *Nash* decision, and *Nash* is, therefore, not in fact in conflict with the holding which I think appropriate here. In the case before us, Drs. Treister and Marrese never obtained a consent decree in their state common law actions. In fact, these plaintiffs never got their case beyond the pleading stage. Instead, the state court merely found (over Justice Simon's persuasive dissent) that the doctors had failed to allege an essential element, economic necessity, of their common law claim.

**13.** The Restatement is therefore squarely against the innovations of the plurality and of Judge Flaum in concurrence.

**14.** "[S]ettlement of state court litigation has been held to defeat a subsequent federal action if the settlement was intended to apply to

claims in exclusive federal jurisdiction as well as other claims." 18 C. Wright, A. Miller, E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4470, at 688 (1981). *Accord Abramson v. Pennwood Investment Corp.,* 392 F.2d 759, 762 (2d Cir. 1968).

Third, there is in the case before us a lack of identity between the Illinois antitrust statute and the Sherman Act. The plurality here concedes that in *Nash* the state statute was a "mirror image" of the federal. *Supra,* at 1153. For one thing, the liability provisions of the Illinois statute (unlike that of North Carolina) are on their face different from the Sherman Act provisions. In addition, the federal statute grants treble damages to a successful plaintiff as a matter of right. The statute in *Nash* did the same. The Illinois statute, however, permits damages in a "rule of reason" case up to a treble amount only at the discretion of the trial court and when the violation was willful. ILL.REV.STAT. ch. 38, § 60–7(2) (1981). Although not considered a significant distinction by the plurality,[15] the availability and structure of monetary damages may make every difference in the world in a plaintiff's decision to pursue a particular remedy. The *Nash* court itself relied on this factor to distinguish *its* decision from the long line of cases which hold that a federal antitrust claim is not barred by the availability of a state antitrust claim.

> In this suit, however, under the state statute, modeled as it is after the federal statute and offering the same right to recover treble damages as the federal statute, there is not the ground for denying *res judicata* effect to the state court judgment stated in [ *Hayes v. Solomon, supra* ] and [ *Cream Top Creamery v. Dean Milk Co., supra,* n. 12].

640 F.2d at 490.[16]

There is a delicate balance in res judicata doctrine between the undesirability of relitigating the same claim and the desirability of having a chance to litigate a particular claim at least once. To ignore *Nash*'s reliance upon absolute identity of claims and to move on to mere similarity of claims is to lose all coherence and predictability in the law of res judicata, as well as to visit manifest injustice upon litigants.

Fourth, the Fourth Circuit in *Nash* did not even suggest that a prior state court action, as different from the subsequent exclusively federal action as were the prior state court actions here, could constitute the same "cause of action." I should think a minimal concern for fairness here ought to prevent us from following the *Nash* approach. As the district court has said with respect to the present case:

> *Nash* considers that a plaintiff who "choos[es] to file the state action on the same cause of action [has] voluntarily waived the benefit, if any, of a federal forum" (640 F.2d at 492)—and that simply does not apply here.

*Marrese v. American Academy of Orthopaedic Surgeons,* 524 F.Supp. 389, 394 (N.D. Ill.1981).

Although the plurality displays an impressive conceptual virtuosity in pursuing a sort of free-floating theory of res judicata, it goes well beyond any precedent or well-accepted explanation. The plurality rationalizes its position by invoking certain policy goals which it purports to further, yet it both overlooks other policies, which are at least as important, and subverts the very policies which it professes to advance.

The first and perhaps most crucial policy at issue here is the one underlying the

---

**15.** The plurality writes, *supra,* at 1156, that "it is doubtful that [the plaintiffs] had any objective in bringing this suit other than to get themselves admitted to membership" and that therefore, presumably, they did not really expect to receive any monetary damages. Yet the plaintiffs *did* seek mandatory treble damages in their federal antitrust claim, and this relief is one which in the state courts is purely discretionary. The plurality's speculation as to why the plaintiffs chose to pursue the litigation strategy they did is beside the point, especially when we have the uncontroverted fact of their request for treble damages before us now.

**16.** *See also Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 818 n. 1 (9th Cir.1982) (the Ninth Circuit, in distinguishing *Nash,* stated that *Nash* does not apply when the antitrust statutes of two jurisdictions are not the same); *Hayes v. Solomon,* 597 F.2d at 984 (prior litigation in state court for breach of a lease does not bar subsequent federal antitrust suit primarily because the state court "could not provide the relief sought in the second forum, federal antitrust damages").

Sherman Antitrust Act. 15 U.S.C. §§ 1 *et seq.* The Sherman Act is our nation's "comprehensive charter of economic liberty" and embodies, together with its judicial interpretations, the fundamental rules of competitive conduct in our national market economy. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958).

> It is not difficult to see ... that a congressional intent that the Sherman Act reach as far as the Constitution permits would embrace virtually any economic act in our infinitely interconnected national economy .... Ours is a unitary national economy. With a few exceptions for contrary state and federal law, ... the Sherman Act commands a competitive regime for which state borders are irrelevant .... [T]he economy is a seamless web in which everything affects everything. What may appear to be relatively local will, in fact, ultimately affect similar or related goods or services moving into or out of a market.

1 P. Areeda and D. Turner, Antitrust Law 229 (1978). If the national economy is a "seamless web," the possible bias of state courts toward local industries and toward local trade customs makes it undesirable that they administer the Sherman Act. In addition, a uniform interpretation of the antitrust laws in the context of uniform rules of federal practice and of *discovery* is necessary to a consistent and predictable application of national policy toward competition.

> Federal judges are relied upon to achieve uniform and expert interpretation of the law in a way that cannot be achieved by Supreme Court review of state decisions. Federal procedure is relied upon to achieve accurate resolution of disputed factual matters, with particular emphasis on the availability of jury trial and searching discovery.

18 C. Wright, A. Miller, E. Cooper, Federal Practice And Procedure § 4470, at 676 (1981) (citations omitted).

The plurality suggests that the reason for exclusive federal jurisdiction must be "a judgment that only federal judges can decide antitrust cases intelligently ...." But the plurality's protestations of respect for the mental prowess of state judges are beside the point and prove too much. If the intelligence of state judges were the only limitation on the abdication of federal jurisdiction, *all* federal claims could be tried in state court and the federal courts could go out of business.

Allowing the different state courts to adjudicate federal antitrust issues would tend to result in 50 different interpretations of the antitrust statutes.[17] Such a state of affairs is inconsistent with the goal of a national regime of competition. Without uniform enforcement in the federal courts, a corporation selling in a national market could, for example, find its prices deemed predatory in one state and not in another. The gain which the plurality may perceive in judicial economy (which is entirely speculative) could be lost many times over through a loss of uniformity and certainty in the application of the antitrust laws, as well as through a need to relitigate the legitimacy of the same practice several times in different state courts.

Second, an important policy goal which the plurality ascribes to *Federated Department Stores* and *Nash* —the lightening and efficient handling of the judicial caseload— is not furthered by the plurality decision here. In fact, the plurality decision may produce a result directly opposite to its professed intentions. Under the views of res judicata espoused both by the plurality and by Judge Flaum, plaintiffs with both state and federal claims will be compelled to file claims in both courts at the same time;

---

**17.** One need only consult the state annotations to the Uniform Commercial Code, which, with slight variations, has been enacted in identical form in virtually every state. There are, of course, different interpretations in the different states. This situation may be acceptable and perhaps desirable in the context of commercial litigation under state law and is the best that can be hoped for where there is no controlling federal statute. Here, of course, there is a strongly controlling federal statute and policy.

furthermore, the cautious plaintiff will be inclined to file all state claims as pendent to a federal claim—the strategy which the plurality recommends. Not only will this require federal district courts to adjudicate many state claims and thus further burden the federal system, but it will specifically require federal judges to decide numerous questions of state law.[18] This result is surely not consistent with the plurality's presumed concern for deference to state courts. In sum, this approach will backfire by moving litigation into federal court, by strengthening the federal role in state matters and by doing nothing to diminish the overall volume of litigation.

Again, as we have noted, this is distinctly not a question of relative intelligence of state and federal judges, but it may be a question of relative expertise. Just as federal judges may have greater experience in the adjudication of federal antitrust claims, so state judges develop more extensive experience in the law of their own state. From this standpoint, there would be no practical advantage in trying Sherman Act claims in state court or state common law claims in federal court. Further, plaintiffs should have the right to choose their forum, particularly when issues of relative expertise are at stake, without their choice being arbitrarily dictated under a rigid doctrine of federal abstention. As Justice Stewart wrote in his dissent to the first panel opinion:

> [t]his expansion of the doctrine of res judicata contradicts the principle, fundamental to our legal system, that parties, not judges, choose the forum in which to resolve their differences and frame the claims advanced in their pleadings.

692 F.2d at 1100.

The plurality approach ignores the possibility that the plaintiff has identified one claim which he believes to be easier to prove than the others. Here the plaintiffs brought a common law claim in state court, which certainly seems plausible to me but

which bears no relation to the antitrust laws. Plaintiffs pursued this course in the expectation, I presume, that they would have an opportunity to bring the federal antitrust claim at some other time, if that proved necessary. I do not see how requiring them to bring the federal claim at the outset—or risk losing it—conserves the resources of the federal court.

Third, I think we should consider seriously the ramifications of the kind of free-wheeling res judicata analysis employed by the plurality. In considering whether the liability and damages standards are the same under the Illinois antitrust statutes as under the federal antitrust statutes, the plurality says:

> The question should be answered not in gross but with reference to the specific provisions of the state and federal statutes, read in light of the specific allegations of the complaint. If, applied to the particular case, the state and federal standards are the same, it should not matter that applied to some other case they might be different.

*Supra,* at 1155.

The plurality then conducts a quite speculative analysis of the plaintiffs' claims under the state statute and their claims under the federal statute. The plurality tracks possible outcomes with respect to liability under both, as well as the respective remedies available under the state and federal statutory schemes. At last, the plurality concludes that the standards of liability would have been the same in a state suit as in a federal suit and that plaintiffs were probably not much interested in the more generous damages provisions of the federal scheme. *Supra,* at n. 15.

This sort of speculation (or second-guessing) about the plaintiffs and their thoughts and intentions is so conjectural as to resemble more a flight of fancy than an exploration of fact. It would be manifestly impractical for us to guess in every case, for example, whether or not the plaintiffs "re-

---

18. An alternative, of course, is that federal courts might decline, in their discretion, to hear the state claim under *United Mine Workers v.*

*Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). This would certainly not economize judicial resources.

ally" needed or "really" sought damages as a basis for determining whether their state action should preclude their federal action. This is surely not the path to certainty in the law, and lack of certainty is a major contributor to unnecessary lawsuits. Nor should we retroactively dictate a party's litigation strategy by determining when and in what court he should have brought his claims.

Fourth and finally, there is a basic problem of fairness in the approach advocated by the plurality. The plurality may have concluded in advance of trial (and even of discovery) that the defendant is a wholly innocent vehicle of professional enlightenment, while the plaintiffs are vengeful malcontents seeking to harass their betters. On this basis, the plurality thinks it appropriate to construct a new law of res judicata to employ the plaintiffs' abortive invocation of state law as a barrier to entry into the federal courts. Dr. Treister has alleged that he was blackballed because he had testified for plaintiffs in medical malpractice suits. If true, this is a claim that federal courts should presumably hear; *see Williams v. St. Joseph Hospital*, 629 F.2d 448 (7th Cir.1980) (allegation that doctors conspired to refuse to treat patients who instigated malpractice suits stated a cause of action under the federal antitrust statutes). We, of course, will never know whether Dr. Treister's allegation is even partly substantiated. Discovery has been blocked in both state court and federal court, and, if Dr. Treister or Dr. Marrese has any just claims, they will be heard by no one.

The plurality is concerned about the possible hardship to those who vetoed the plaintiffs' membership applications (or their informants) if the plaintiffs should identify them and subsequently take their depositions. Nothing is said about the hardship to Drs. Marrese and Treister of being excluded without stated reason from this powerful association of orthopaedic surgeons, which bears a coveted seal of approval. Harassment by discovery is to be deplored but not

more so than arbitrary and unjust denial of access to the federal courts.

I therefore respectfully dissent.